[Crim. No. 20010. Second Dist., Div. Two. Jan. 24, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
SUZANNE FLORES, Defendant and Appellant.

**COUNSEL**

Richard S. Buckley, Public Defender, James L. McCormick, Charles Gangloff and Edward Van Gelder, Deputy Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Ronald M. Weiskopf, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**ROTH, P. J.**—Suzanne Flores was convicted of having in her possession for sale restricted dangerous drugs, amphetamine and sodium secobarbital, in violation of section 11911 of the Health and Safety Code. She appeals from the judgment of conviction which followed a trial by the court consisting wholly of proceedings under Penal Code, section 1538.5.

Respondent has adopted appellant's statement of facts with certain additions. As augmented by respondent's brief, we set forth the facts summarized by appellant:

"Victor J. Terry is a police officer, employed by the City of Los Angeles, assigned to Harbor Division Patrol. On September 6, 1970, around 1:00 A.M., he observed the defendant, Suzanne Flores, driving alone in a vehicle, northbound on Pacific Avenue, near 28th Street. Officer Terry testified that the vehicle was weaving back and forth within the lane, although it never actually crossed over the line marking the traffic lane. Thinking that the driver was possibly under the influence, Officer Terry stopped the vehicle.

"After stopping the vehicle, Officer Terry observed no symptoms to indicate that Miss Flores was under the influence of anything. He asked to see her operator's license, and explained why he had stopped her. Miss Flores explained that she was looking up an address in a notebook, which she showed to the officer. The address she was looking for, 24th and Denison, was about six blocks north, and Officer Terry instructed her how to get there. Miss Flores then drove off.

"About an hour later, around 2:00 A.M., Officer Terry again saw Miss Flores. Her vehicle, a 1963 F-85 Oldsmobile, was coming out of a dark* alley south of 40th Street and Pacific, about 15 blocks south of where he had observed her the first time. Officer Terry estimated the speed of the vehicle in the alley at about five miles an hour.

"Officer Terry then testified that as the vehicle entered the street, Miss Flores looked at him, appeared 'to have a startled look on her face,' then turned right onto Pacific, heading north.

*"The area was one in which several burglaries had been committed, some that very evening, and Officer Terry had received information that during the course of the month there were two descriptions of a woman

---

*Modifications in the text of appellant's opening brief are indicated by *.

in a late model, light-colored vehicle described in burglary reports. The reports indicated a woman to have been seen in a vehicle on two different occasions in connection with two burglaries in close proximity to the area. Appellant's vehicle had a white top on it. There were private residences in the alley.

"Officer Terry, who had been heading southbound on Pacific, then made a u-turn, put on his red lights, and pulled in behind Miss Flores. He testified that his reasons for stopping her were that the area was a high burglary area, that a woman had been seen in a car in two reported burglaries, and that they taught him at the police academy that women will sometimes act as lookouts in burglaries. After he pulled behind her vehicle, about 50 to 75 feet behind, he hit his horn and flicked on his high beams.

"According to Officer Terry, Miss Flores then looked back at him, looked forward, then turned right on to 40th Street. She went past a parking space at the corner, and went down almost a block and a half before she stopped the vehicle. During that time Officer Terry observed Miss Flores to lean to the right of the vehicle so that he lost sight of her right shoulder. He could not see her right hand, but her head moved over to the center of the front seat. She also passed a second place where she could have parked.

"When Miss Flores stopped her vehicle, Officer Terry asked her to exit the vehicle, which she did via the driver's door. Officer Terry asked her to step to the rear of the vehicle, went toward the passenger side, and opened the door.* He testified that he did so because '. . . I wasn't sure what it was she had placed up front. I thought possibly a weapon, or any number of things.' Miss Flores came between the officer and the door, stopped him from entering, and told him he didn't have the right to search her vehicle.

"Officer Terry told her she would have to get out of the way, and as he grabbed her wrist and walked her back to the police car, she yelled out, 'George, George, they have got me.' Officer Terry then returned to her vehicle. He testified that this conduct added to his suspicions, that a weapon or contraband had been placed in the glove box, because of the furtive movement he had seen before.

"The only persons around were two girls who were exiting a house across the street. Officer Terry opened the door to the vehicle again, and observed the glove box. He opened the door to the glove box, and observed a small brown paper bag on top of some papers. He removed the bag, which had small bumps on it, and looked inside. He couldn't recall if he had to open

the bag all the way or not. Inside the bag were twenty to thirty separate packages, each one containing fifty or sixty red and white pills.

"Officer Terry ascertained that the vehicle was registered to Miss Flores, then arrested her for possession of dangerous drugs for sale. In the trunk he found thousands of pills, wrapped up in a large baggie, which he took to Harbor Division station.

"By stipulation, policewoman Ephraim testified that she searched the defendant after she was arrested, and recovered a vial of red capsules from her bra.* Also, by stipulation, F. James Bearhart testified that he examined 4,000 red pills which he found to be secobarbital, and 13,500 white pills which he found to be amphetamine.

"Frederick Carrozo testified that in his expert opinion, the amphetamine and secobarbital was possessed for sale.

*"In her own defense, Suzanne Flores testified that when she saw the red lights of the police car when she was stopped the second time, she pulled over into the first available parking space. She parked almost in front of her destination, which was the house of George and Gail Karen on 40th Street. She had circled the house to make sure that the people were awake, had gone through the alley and had seen that the lights were on, and was coming around the front again to park when the two officers that had stopped her before stopped her again. Miss Flores denied knowing what was in the bag, but admitted being convicted of a prior felony of possession for sale of marijuana."

■ Appellant challenges the lawfulness of her second detention, contending that none of the factors relied upon by Officer Terry constituted the requisite legal basis for her, or any, detention. However, the factors which were present may be listed as follows: (1) darkness, to wit: a dark alley at 2 a.m. (*People* v. *Cruppi,* 265 Cal.App.2d 9, 12 [71 Cal.Rptr. 42]); (2) the area was one in which several burglaries had been committed, two of which had involved a woman in a light colored vehicle (the officer had information that burglaries had been committed that very evening); (*People* v. *Manis,* 268 Cal.App.2d 653, 660 [74 Cal.Rptr. 423]); (3) her movement, after the signal to stop had been given, toward the right of the vehicle, and, significantly, her act in driving her slow moving vehicle for a block and a half, past two parking spaces after the officer's signal. (*People* v. *Hines,* 260 Cal.App.2d 13, 16 [66 Cal.Rptr. 875].)

Based on these factors, the first of the three criteria for a temporary detention (*People* v. *Henze,* 253 Cal.App.2d 986, 988 [61 Cal.Rptr. 545]) was met: the officer's suspicion that "some activity out of the ordinary is or has taken place" was, indeed, rational. (*Id.*) (He was, of course, not required to forget that he had stopped appellant about an hour ago and directed her to an address not in the vicinity of the dark alley where he now found her.) There was further "some indication" to connect appellant, a woman driving a car with a white top in an area containing private residences, with burglaries which had involved a woman in a light-colored vehicle. (*Id.*) Finally, appellant's presence in the area, and her evasive and furtive activity, contained the suggestion that her activity was "related to crime." (*Id.*) We find the detention to have been lawful.

Next, appellant contends that the search of the vehicle subsequent to the detention was unlawful since the "furtive movement" could not justify it. Primary reliance is placed on the recent decision in *People* v. *Superior Court* (*Kiefer* r.p.i.) 3 Cal.3d 807 [91 Cal.Rptr. 729, 478 P.2d 449].

In *People* v. *Wigginton,* 254 Cal.App.2d 321 [62 Cal.Rptr. 104], cited in the *Kiefer* decision (3 Cal.3d at p. 825, fn. 11), police observed a vehicle with a broken window, suggesting theft, followed it and were in turn spotted by the defendant who then moved to the right hand side and appeared to place something under the seat. The Court of Appeal found the search and ensuing arrest to be lawful. The facts at bench are, of course, even stronger than those of *Wigginton* and, in *Kiefer's* words, they ". . . impart a guilty connotation to the furtive gesture now engaging our attention." (3 Cal.3d at pp. 824-825.) The nature of the neighborhood, the report of current burglaries, failure to stop despite two opportunities (see discussion in *Kiefer* at p. 825), the reasonable likelihood that appellant was connected to the burglaries, and the early morning hour, each and together gave an almost indelible complexion to appellant's motion, while seated in the car, toward the right.

The officer testified that he opened the door because he thought that appellant had secreted a weapon or "any number of things." ■ "The right to investigate gives rise to the right to conduct a reasonable search for weapons in order to protect the safety of the officers. [Citations]. The fact that the search extended beyond the person of the defendants to the automobile in which they were riding and to that portion where the officers saw one of them lean over and appear to place something under the seat, does not make the search illegal." (*People* v. *Wigginton, supra,* 254 Cal.App.2d 321, 326.)

██ The officer's decision to search the glove compartment was proper and within the law. Once he had made that decision, appellant's shout "George, George, they've got me" only added to the reasons why the officer could and, in the proper performance of his duty, should have searched the vehicle, as in fact he did.

The judgment is affirmed.

Herndon, J., and Fleming, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 22, 1972. Peters, J., was of the opinion that the petition should be granted.