[Crim. No. 25376. Second Dist., Div. Three. Mar. 26, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM ADRIAN TAYLOR, Defendant and Appellant.

**COUNSEL**

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, and Lawrence P. Scherb II, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**DELL, J.**\*—Defendant, convicted by a jury of three counts of first degree burglary and one count of attempted second degree burglary, was sentenced to state prison.[1] He appeals.

There is no issue raised as to sufficiency of the evidence to support the convictions. Defendant, however, claims error in the following particulars:

1. Denial of his motions to suppress the fruits of his arrests on June 22 and November 20, 1973.

2. Disallowance of his challenge to the jury panel.

3. Denial of his motion for mistrial.

4. Denial of his motion for dismissal of the information for alleged denial of his right to a speedy trial.

---

*Assigned by the Chairman of the Judicial Council.

[1] He was found guilty of counts I, VII and VIII, all of them first degree burglary, and IX, attempted burglary, in which the jury was not required in the verdict form to make a finding as to degree; hence, that conviction must be deemed to be of attempted burglary in the second degree (Pen. Code, § 1157). Defendant was sentenced to state prison consecutively on counts I and VII. He was also sentenced to state prison on counts VIII and IX, but sentences on those counts were stayed, the stays to become permanent upon completion of the sentences on counts I and VII. The likely purpose of the trial court's action was to follow the procedure approved in *People* v. *Niles*, 227 Cal.App.2d 749, 755-756 [39 Cal.Rptr. 11] (see *In re Wright*, 65 Cal.2d 650, 655-656 [56 Cal.Rptr. 110, 422 P.2d 998]), but such action was at best unnecessary, since in view of the existence of separate victims, state prison sentences on all counts, whether concurrent or consecutive, would not have violated Penal Code section 654. (See *People* v. *Milan*, 9 Cal.3d 185, 197 [107 Cal.Rptr. 68, 507 P.2d 956].)

We seriously question the trial court's authority to stay execution as to counts VIII and IX (see Pen. Code, § 1168) under the circumstances of this case. However, since neither party has raised the point and we can conceive of no manner in which the defendant can be deemed aggrieved, we see no purpose in remanding the case to deal further with those counts.

5. Denial of his motion to exclude, for impeachment purposes, evidence of an admitted prior felony conviction.

We have examined the entire record, including superior court files A-127914 and A-126656.[2] We set forth the relevant evidence in some detail.

# I

## The Arrest of June 22, 1973

On June 22, 1973, at 4:40 or 4:45 a.m., Officers Donald J. Burch and Michael J. Thomas of the Los Angeles Police Department were on patrol in a marked police vehicle at Topanga Canyon and Saticoy. They received an "all units call" that a "cat burglary" had occurred at 20216 Delita. This location is two or three blocks south of Ventura and within a block or two of Winnetka.

The officers arrived at the intersection of Winnetka and Ventura within three or four minutes and parked at the northwest corner. They saw a yellow van proceeding on Winnetka. The defendant, a male Negro, was driving. Only four or five minutes had elapsed. The direction in which the van was proceeding was away from the location of the burglary. The officers caused the vehicle to stop. Burch went up on the passenger side of the van and saw defendant reaching over toward the passenger seat. He told defendant to put his hands on the steering wheel. He looked into the van and saw an orange furniture dolly, a stereo and a plastic container normally used for going on picnics or storing frozen items. He also saw on the floor a knife, screwdriver, flashlight and a pair of brown gloves.

Thomas, suspecting the defendant of having possibly committed a burglary, asked him to alight from the vehicle and patted him down for tools and weapons. He saw a screwdriver in defendant's left front pocket. Thereafter, appellant was arrested and transported to the West Valley police station. The van was driven there by another officer. The van was searched at the station and certain property found therein was booked. At the trial Burch testified that following a search of the van at the police

---

[2]Rule 12(a), California Rules of Court. The cases were consolidated and counts I through V of case No. A-126656 became counts VII through XI of consolidated case No. A-127914. Counts X and XI were then severed and dismissed after defendant was sentenced to state prison.

station, he recovered an ice chest containing frozen meat and butter, a stereo, a small television set, a chess set, a handbag and a small .25 caliber automatic pistol with a clip. All of these items excepting the pistol were identified by Don Paul and Irmgard Huth as having been taken from their respective homes some time between the night of June 21 and 6 or 7 a.m. of June 22.

Prior to seeing the yellow van, Burch had received the following information: He had heard on the radio that "a cat burglar[3] was working south of the Boulevard . . . south of Ventura." He had information from "DO sheets"[4] that there was a "cat burglar working . . . south of the Boulevard; North Hollywood-Van Nuys Division; West Valley Division, hitting approximately two to three houses each time he would hit. Also that it was a male Negro, 5'10", 170-180 pounds." Being taken in the burglaries were "large items . . . such as color TV's, larger TV's. And it would take approximately either two men to carry these items or a mover's dolly to move them." These burglaries were occurring between approximately 11 p.m. and 3 a.m. Burch had known of the cat burglar for at least a month prior to June 22. He had heard on two occasions about a yellow van being used, once over the radio and once, three or four nights later, at roll call from Investigator (Sergeant) Lee. On both occasions a Negro male had been described. The radio call further described the suspect as 5'10" to 5'11", 170-180 pounds. The roll call was on June 18 or 19.

Lee had discussed a number of "cat burglaries".: "the one in Van Nuys, also the ones south of the Boulevard [*sic*] in the Van Nuys Division, North Hollywood, West Valley." He talked about one burglary where a shot was fired *at* the burglar[5] and where mace was used on a victim.

Prior to seeing the yellow van, Thomas had received the following information: At roll call Lee had spoken of burglaries south of "the Boulevard" where he suspected the existence of a dolly or multiple suspects because of the large items taken; a yellow van was also mentioned. He had heard a broadcast five or six days prior from Van Nuys concerning the burglary where a yellow van was involved. He had

---

[3]The term "cat burglary" is synonymous with "hot prowl"; it means a burglary of occupied residential property committed at night while the occupants are asleep.

[4]Daily occurrence handouts to the officers at roll call.

[5]From the context of Burch's testimony and later testimony by Thomas and Lee himself, we think Burch meant to say that a shot was fired *by* the burglar.

seen daily occurrence sheets which listed information several days prior, including numerous burglaries which had occurred south of the boulevard involving large items taken with possible dollies. Also, Lee had told of an occasion where a suspect shot a pistol at a victim and an occasion where mace was used on a victim. The modus operandi was that of a "cat burglar."

Defendant contends initially that the detention of June 22 was unlawful but, should that argument be rejected, the People did not meet their burden of proving the source of the "probable cause" information in their possession. We discuss those contentions in turn.

"While a detention of a citizen by a police officer based on a 'mere hunch' is unlawful, if there is a rational *suspicion* that some activity out of the ordinary is taking place, and some *suggestion* that the activity is related to crime, a detention is permissible. [Citations.]" (*People* v. *Gravatt,* 22 Cal.App.3d 133, 136-137 [99 Cal.Rptr. 287], cited with approval in *People* v. *Gale,* 9 Cal.3d 788, 797-798 [108 Cal.Rptr. 852, 511 P.2d 1204]; italics in original.) ■ It is manifest that the appearance of defendant in the yellow van in such close proximity in time and space to the "cat burglary" reported at 20216 Delita, the direction of ·movement of the van, and the sex and race of the defendant—coupled with the information already possessed by Officers Burch and Thomas —lent credence to a "rational suspicion that some activity out of the ordinary [was] taking place, and some suggestion that the activity [was] related to crime." An objective perception of events should have indicated to reasonable men that the detention and questioning of defendant was not only appropriate, but necessary ·to the proper discharge of their duties. (Cf. *Irwin* v. *Superior Court,* 1 Cal.3d 423, 426 [82 Cal.Rptr. 484, 462 P.2d 12].)

Once the stopping of defendant's vehicle and his detention had been completed, no "search" was necessary for Burch to discern possible fruits of the burglary[6] as well as instrumentalities of burglary. In addition, Thomas found a screwdriver in defendant's left front pocket. We are satisfied that there was probable cause to arrest the defendant for burglary. (See Pen. Code, § 836, subd. 3.)

■ Defendant next claims a violation of the so-called *Harvey-Madden* principle,[7] as articulated in *Remers* v. *Superior Court,* 2 Cal.3d

---

[6]Actually, what he saw comprised items taken in two separate burglaries.

[7]Defendant refers to *People* v. *Harvey,* 156 Cal.App.2d 516, 523 [319 P.2d 689], and *People* v. *Madden,* 2 Cal.3d 1017, 1021 [88 Cal.Rptr. 171, 471 P.2d 971].

659, at pages 666-667 [87 Cal.Rptr. 202, 470 P.2d 11]: "It is well settled that while it may be perfectly reasonable for officers in the field to make arrests on the basis of information furnished to them by other officers, 'when it comes to justifying the total police activity in a court, the People must prove that the source of the information is something other than the imagination of an officer who does not become a witness.' (*People* v. *Adkins,* 273 Cal.App.2d 196, 198 [78 Cal.Rptr. 397]; *People* v. *Lara,* 67 Cal.2d 365, 374 [62 Cal.Rptr. 586, 432 P.2d 202]; *People* v. *Rice,* 253 Cal.App.2d 789, 792 [61 Cal.Rptr. 394]; *People* v. *Pease,* 242 Cal.App.2d 442, 448-450 [51 Cal.Rptr. 448]; *People* v. *Harvey,* 156 Cal.App.2d 516 [319 P.2d 689].) To hold otherwise would permit the manufacture of reasonable grounds for arrest within a police department by one officer transmitting information purportedly known by him to another officer who did not know such information, without establishing under oath how the information had in fact been obtained by the former officer. (Cf. *People* v. *Adkins, supra,* 273 Cal.App.2d 196, 198; *People* v. *Harvey, supra,* 156 Cal.App.2d 516, 523.) 'If this were so, every utterance of a police officer would instantly and automatically acquire the dignity of official information; "reasonable cause" or "reasonable grounds," . . . could be conveniently fashioned out of a two-step communication; and all Fourth Amendment safeguards would dissolve as a consequence.' (*People* v. *Pease, supra,* 242 Cal.App.2d 442, 449.)

"In sum, when an officer furnishes to another officer information which leads to an arrest, the People must show the basis for the former officer's information. More specifically in relation to the instant case, when an officer furnishes to another officer information as to alleged prior criminal activity of an individual relied upon for an arrest relating to subsequent activities of that individual, then the People must show the basis for the former officer's information. The absence of such a requirement would allow a police officer to manufacture reasonable grounds to arrest while circumventing the necessity of pointing to 'specific and articulable facts' (*Terry* v. *Ohio, supra,* 392 U.S. 1, 21 [20 L.Ed.2d 889, 906]; see *People* v. *Collins, supra,* 1 Cal.3d 658, 662 [83 Cal.Rptr. 179, 463 P.2d 403] justifying his suspicions."

The prosecution produced as a witness Sergeant Gilbert F. Lee of the Los Angeles Police Department (undoubtedly the same "Investigator Lee" referred to by Officer Burch) who testified that he was during the months of February through June 1973 coordinator for burglary investigations in the West Valley Investigation Division; early in February a series of burglaries began "which we classify as hot prowls,"

in which victims in the residence are asleep when the burglary occurs; these incidents were taking place primarily south of the Ventura Freeway in the West Valley division; sometimes there were two or three in an evening, mostly after midnight; he coordinated with other police divisions and met twice per week with other investigators, "almost daily"; he read all applicable reports and discussed distinctive matter with other investigators; he met with radio car officers; he would go to roll calls and impart the information in his possession. Shortly prior to defendant's arrest he was told of one North Hollywood "hot prowl" burglary where the victim reported hearing a van type of vehicle leave the scene; in another Van Nuys burglary, a woman saw a male black driving a yellow van; in another West Valley burglary a gray or off-white station wagon was described as leaving the scene of a "hot prowl" burglary. He described other incidents in which a shot was fired by a burglary suspect either at the victim or into the ground, and another incident in which a black burglary suspect sprayed mace into a victim's face.

Sergeant Louis H. Holland of the Los Angeles Police Department testified that between February and June of 1973 he was burglary coordinator for the Van Nuys Investigative Division and had six burglary investigators working directly under him. In mid-June 1973, he attended a "north-south Mulholland burglary investigators' meeting" at the Van Nuys police station. Sergeant Lee was present during the meeting when a yellow van was described as having been seen in the southwest district of the Van Nuys division. Holland recalled a yellow van and a light colored station wagon both being mentioned. He remembered seeing information regarding the yellow van being on a report. It might have been either an Investigator Watson or himself who related the incident of a yellow van. He believed it would have been Investigator Watson, but was not certain, who interviewed the victim who mentioned the yellow van. He did recall that the report in which the yellow van was mentioned was a "hot prowl burglary."

The prosecution also called Officer Terry L. Wessel, who sent out the June 22 radio call reporting the burglary at 20216 Delita Drive. He put the call out at 4:20 a.m. as a "CB," meaning "cat burglary."

In addition, the prosecution offered into evidence, and the trial court received, 48 crime reports from the West Valley division representing a portion of the "cat burglaries" described by Sergeant Lee.

We are satisfied that the requirements of *Remers, Madden* and their predecessors were met, and that the "source of the information" in the possession of Officers Burch and Thomas was *not* "the imagination of an officer who [did] not become a witness." (See *People* v. *Adkins*, 273 Cal.App.2d 196, 198 [78 Cal.Rptr. 397].)

II

THE ARREST OF NOVEMBER 20, 1973

On November 20, 1973, at about 2 a.m. Officers Charles S. Melvin and Dennis Ulick were driving westbound on Mulholland Drive about three to five miles east of Canoga Avenue. A light green or gray Oldsmobile, which appeared to be a 1965 or 1966 Cutlass, approached them in a desolate area. They stopped their car, turned and looked back toward the direction of the vehicle that just passed them, when they observed the brake lights on the vehicle come on. The vehicle backed up to the officers' location. The officers had in their possession a reproduced intelligence card and a map given to them by Sergeant Lee. They recognized the individual driving the Cutlass to fit the general description given by Lee and to be a William Adrian Taylor whose name was on the intelligence card.

Three vehicles had been previously described to the officers, one of which was a two-door 1966 Oldsmobile. The possible license on that vehicle was SKM 372, according to Ulick; Melvin was sure about the SKM but not of the numbers, which at one time he testified were "275." He did notice, however, that the license number on the Cutlass operated by defendant matched the license number given him by Lee.

The officers had been told of defendant's arrest in June and, knowing that he had been armed at that time, suspected that he might be armed again. The officers had exited their vehicle when defendant told Ulick that he was lost and asked him how to leave the area. Melvin shined his flashlight into the vehicle looking for other people or weapons. He saw a glove immediately in front of the driver's seat and on the console between the front seats he saw a screwdriver, kitchen knife, a pair of wire or tin snips, and a flashlight. On the left rear floor board he observed what appeared to be a handgun, although Ulick thought it was only a plastic replica of a pistol.[8] After observing the plastic pistol, Ulick asked

---

[8]Ulick turned out to be correct, since the item was not a real handgun, but a blue plastic water pistol.

defendant, who had already produced his driver's license, to exit the vehicle and step over to the police vehicle and he complied, stating, "How did you know it was me?" or "How did you guys know about me?" Ulick replied something to the effect, "Well, we know all about you, Mr. Taylor," and conducted a cursory search for weapons, but did not find any.

Melvin asked for permission to look in defendant's trunk and defendant responded to the effect of: "Sure, man. Go ahead." Or "Yeah, it's okay. Yeah, man, go ahead." In the trunk Officer Melvin found a red typewriter case, a woman's suede jacket or coat, a woman's brown purse, two flashlights, a set of sockets, and a ceramic doll or figurine type. He turned to Ulick and "told him to cuff Mr. Taylor, yes, that he was under arrest." He was of the opinion that the items he had seen in the trunk might have been "taken in a burglary."

As soon as Ulick reached for his cuffs, Mr. Taylor said something like, "You are going to have to shoot me, because I'm leaving," or "You are going to have to shoot me to catch me," and started running. Defendant fell over the edge of the roadway onto an abandoned car and the officers went down, cuffed him and brought him back to the roadway. They transported him to a hospital because he complained of an injury to his leg.

Manifestly the original stopping of defendant's vehicle was not a detention at all, but initiated by defendant to make a request for information. Both of the officers recognized defendant before they detained him. Defendant was driving at 2 a.m. in a desolate area in a vehicle which matched the description of one which might have been used by a burglary suspect. The officers knew of the series of "cat burglaries"; they knew defendant had been previously arrested for such burglaries and that a handgun had been recovered. Failure to undertake at least a cursory interview of the defendant would, in our judgment, have been a serious dereliction of duty. There was no impropriety in the initial detention. (See *People* v. *Flores,* 23 Cal.App.3d 23, 27-28 [99 Cal.Rptr. 858]; *People* v. *Rosenfeld,* 16 Cal.App.3d 619, 622 [94 Cal.Rptr. 380].)

The following additional facts transpired subsequent to the detention: Defendant confirmed his identity as a known burglary suspect; he uttered the equivocal but certainly suspicious remark, "How did you know it was me?"; such not always innocuous items as a glove,

screwdriver, kitchen knife, wire snips, and flashlight—as well as a handgun, real or simulated—were seen in the car. Pursuant to what the trial court found to be defendant's free and voluntary consent, the opening of his trunk revealed a typewriter case, a woman's jacket or coat, and a purse. Then defendant attempted an immediate escape. We have no doubt that the arrest, under these circumstances, was lawful.

■ We have made only passing reference to the search of defendant's trunk. The evidence on the issue of consent was, as is not unusual in cases of this nature, conflicting. Officers Melvin and Ulick each testified that prior to defendant's being placed under arrest, he approved the inspection by saying something to the effect of: "Sure, man. Go ahead." Defendant's testimony is to the contrary. It was for the trial judge, who saw and heard the respective witnesses, to determine their credibility. We are unwilling and unable to hold that as a matter of law, upon conflicting evidence, there was either an absence of consent or a "submission to authority." The trial judge's determination was based upon substantial evidence and as such is binding upon the reviewing court. (See *People* v. *Lawler,* 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621]; *People* v. *Smith,* 26 Cal.App.3d 404, 409 [102 Cal.Rptr. 625]; Witkin, Cal. Criminal Procedure (1963) Appeal, § 683.)

■ In any event, we are satisfied that even in the absence of a search of the trunk, there was probable cause to arrest defendant upon suspicion of burglary. Similarly, there was reasonable cause to believe that the vehicle contained contraband or instruments or evidence of a crime, and thus it was subject to search even in the absence of consent. (See *Chambers* v. *Maroney,* 399 U.S. 42, 48-49 [26 L.Ed.2d 419, 426-427, 90 S.Ct. 1975]; *People* v. *Laursen,* 8 Cal.3d 192, 201-202 [104 Cal.Rptr. 425, 501 P.2d 1145]; *People* v. *Dumas,* 9 Cal.3d 871, 881-886 [109 Cal.Rptr. 304, 512 P.2d 1208], and concurring opinion of Sullivan, J., at p. 886; *People* v. *McKinnon,* 7 Cal.3d 899, 907, 911 [103 Cal.Rptr. 897, 500 P.2d 1097].)

## III

### CHALLENGE TO THE JURY PANEL

On February 11, 1974, defendant filed a challenge to the jury panel which was heard on February 25, 1974. This date was prior to jury impanelment and the challenge was timely (Pen. Code, § 1060).

Counsel stipulated to the following matters:

"1. That the panel of trial jurors for the Superior Court of the State of California for the County of Los Angeles, Central District, is comprised of persons selected from all the judicial districts of Los Angeles County in proportion to the number of inhabitants therein;

"2. That the panel of the trial jurors for the Superior Court of the State of California, County of Los Angeles, Northwest District, is comprised only of persons who live in said Northwest District and not from all the judicial districts in the County of Los Angeles;

"3. That sessions of the Superior Court of the State of California, for the County of Los Angeles, Northwest District, including sessions of Department Northwest 'S' of said court, are held within the City of Los Angeles;

"4. That the City of Los Angeles is the county seat for the County of Los Angeles;

"5. That Los Angeles County is a county of the first class within the meaning of the California Code of Civil Procedure."

It was further stipulated that the "percentage of Negroes on the jury panel for the Central District is greater than the percentage of Negroes on the jury panel for the Northwest District." The court took judicial notice that more than one million individuals lived in the Northwest District and, upon submission of the motion, denied it without comment.

On appeal defendant contends that the jury selection procedure used for his trial is violative of express statutory provisions and further deprives him of due process of law and the equal protection of the laws. We analyze those contentions.

Code of Civil Procedure section 206[9] then provided in pertinent part as follows: "The names for the trial jury list shall be selected from the different wards or judicial districts of the respective counties in proportion to the number of inhabitants therein, as nearly as the same can be estimated by the persons making the lists. The trial jury list shall be kept separate and distinct from the grand jury list. In a county of the first

---

[9]Hereafter, simply "section 206."

class, where sessions of the superior court are held in cities other than the county seat, the names for such list to serve in the city shall all be selected from the district in which the city is located and no names from such district shall be selected to serve as trial jurors for any other part of the county, other than in the county seat."[10]

Fundamental to the proper analysis of defendant's argument is some discussion of the legislative history of section 206 and of the Los Angeles County superior court branch court system.[11]

Prior to 1875-1876 section 206 read: "Such lists must contain not less than one for every hundred inhabitants of each township or ward . . . ." The 1875-1876 amendment provided that "[t]he names for all such lists shall be selected from the different wards or townships of the respective counties, in proportion to the number of inhabitants therein, as nearly as the same can be estimated by the persons making such lists." The 1880 reenactment and the 1881 amendment carried forward the same language as to "different wards or townships."

In 1923 the section was for the first time amended to make specific reference to so-called branch court trials in Los Angeles County: ". . . in counties of the first class, where sessions of the superior court are held in cities therein, other than the county seat, the names for such lists to serve in said city shall all be selected from the townships in which said city is located; and provided, further, that no names from said township shall be selected to serve as trial jurors for any other part of the county."

In 1951 the term "township" was replaced by "judicial districts" and "districts." The 1959 amendment provided for separate lists for trial and grand jurors. The 1963 amendment added the words "other than in the county seat" at the end of the section.

Although recognized by section 206 in 1923, it appears that branch courts did not come into existence until 1928, with the advent of the

[10]The 1974 Legislature amended section 206 effective January 1, 1975, to provide that in Los Angeles County "all trial jurors shall be selected annually on a countywide basis," exempting a person "from liability to act as a juror in any court which is more than 20 miles from his residence . . . ." (Stats. 1974, ch. 806, p. 2258.) This statutory change does not affect our opinion as to pre-1975 construction.

[11]"A Study for Districting Superior Courts," prepared in 1959 by the Regional Planning Commission and the Chief Administrative Officer of Los Angeles County, has been a valuable aid in our research. In future references, we shall call it the "Study."

Long Beach branch.[12] In the next decade Pasadena, Pomona and Santa Monica were established as branch courts, and by 1959 superior court sessions were being conducted in Glendale, Inglewood, San Fernando and Burbank as well, on a full-time basis. Sessions were also being conducted in Lancaster once a week.[13]

The statutory basis for the full-time branch courts—all of which, it will be noted, were located in incorporated cities "other than the county seat"—was a series of "spot" enactments by the Legislature requiring or authorizing sessions in various cities having a specified minimum population and minimum distance from the county courthouse or county seat.[14]

The Lancaster situation was dealt with by a specific law authorizing a session at least weekly "at any designated place in the county, not less than 45 miles distant from the county seat, measured by air line. The place designated shall be within a judicial district, composed wholly of unincorporated territory, with a population of more than 40,000 . . . ." (Gov. Code, § 69744.5.)

Until 1959 the Government Code made no provision for establishing "superior court districts" within a county, but simply required or authorized the holding of "sessions of the superior court" in the qualifying cities[15] or unincorporated county area.[16] "Upon qualification of a city or area for a branch court, the Superior Court Rules Committee set up district limits which were then ratified by majority vote of the judges. These boundaries were not formalized by legislative enactment . . . ." (Study, p. 3.)

---

[12]Study, page 3.

[13]See footnote 12.

[14]See, e.g., Government Code sections 69742 (population not less than 35,000 with distance not less than 8 miles from county courthouse), 69744 (any place not less than 120 miles distance from county seat; population not less than 7,000 with distance not less than 55 miles from county courthouse; population not less than 2,200 with distance not less than 60 miles from county courthouse), 69745 (population not less than 7,000 with distance not less than 55 miles from county courthouse), 69746 (population not less than 20,000 with distance not less than 30 miles from county courthouse), 69747 (population not less than 50,000 with distance not less than 6 miles from county courthouse), 69751.5 (population not less than 7,000 with distance not less than 30 miles from county courthouse), 69748 and 69748.1 (numerous conditions in addition to city's minimum population and distance from county courthouse).

[15]See footnote 14.

[16]See Government Code section 69744.5.

At the initiative of the Los Angeles County Board of Supervisors and Superior Court a "moratorium" was effected during the 1957 legislative session to preclude establishment of new branch courts within 14 miles of each other. (Gov. Code, § 69749.) The effect of this legislation was to forestall single-judge branch courts in such cities as Redondo Beach, West Covina, Pico Rivera, Norwalk and Whittier.[17] The 1959 Legislature, acting at the request of the Los Angeles County Board of Supervisors and Superior Court, enacted Government Code sections 69640-69650, pertaining only to Los Angeles County ("any county [with] a population of not less than 4,000,000" (Gov. Code, § 69641)), which authorized the board of supervisors to then divide the county into not more than nine (but potentially as many as eleven) superior court districts at which "sessions of the superior court shall be held." (Gov. Code, §§ 69641, 69643, 69645.)

Thus by 1972 the Los Angeles County Superior Court branch court system had developed as stated by Presiding Justice Ford in *Adams* v. *Superior Court*, 27 Cal.App.3d 719, at page 722 [104 Cal.Rptr. 144]: "Historically, the courthouse has been located at the county seat. While the county seat of Los Angeles County is the City of Los Angeles, the gradual and substantial increase in population [fn. omitted] and the unusually large geographical area of the county have resulted in the establishment of branch courts as a means of maintaining efficient judicial administration. That growth has culminated in the establishment of eight judicial districts, supplementing that portion of the court system retained at the county seat and which is geographically within the area presently designated as the Central District. Thus, there are now nine geographical areas constituting specifically named districts. [¶] The designation and functions of the various districts are set forth in the Rules of the Superior Court of Los Angeles County."[18]

---

[17]Study, pages 3 and 4; letter dated January 15, 1959, chief administrative officer to board of supervisors, page 6.

[18]The present districts and the sites of courthouses located therein are: Central (Los Angeles Civic Center), East (Pomona), North Central (Burbank and Glendale), Northeast (Pasadena), Northwest (Van Nuys and Lancaster), South (Long Beach), Southeast (Norwalk), Southwest (Torrance), and West (Santa Monica).

It is already noted that each courthouse site away from the Los Angeles Civic Center is an incorporated city "other than the county seat," excepting Van Nuys, which we take judicial notice formerly was a "town"—an unincorporated village (see Gov. Code, § 21; *People* v. *Van Nuys Lighting District*, 173 Cal. 792, 794 [162 P. 97])—and now is simply a historical and post office designation for a portion of the City of Los Angeles. It is apparent that the Northwest District is by far the largest of the nine court districts in area and that the remotest portions of the Northwest District are farther away from the Civic Center than any portions of any other districts. (See Appendices I and VI to Los Angeles Superior Court Rules, which are reproduced at pp. 537, 538.)

Although section 206 purported to limit the service of a juror resident in an outlying district to that district from the 1923 amendment until the 1963 amendment, it is noteworthy that from at least 1948 until December 23, 1969, "jurors for the Central District [were] drawn from the entire county but . . . jurors for any other district [were] drawn solely from the geographical area of that district."[19] (*Adams* v. *Superior Court, supra,* 27 Cal.App.3d at p. 724; see also *People* v. *Crossan,* 87 Cal.App. 5, 11 [261 P. 531].)

█ Defendant contends that since Van Nuys—unique among all Los Angeles Superior Court courthouse sites apart from the Los Angeles Civic Center—is a part of the City of Los Angeles, it is a part of the "county seat" and thus, according to section 206, defendants tried there are entitled to a county-wide draw for jurors.

Initially we reject defendant's premise as to the court facilities at Van Nuys being a part of the "county seat": "Historically, the center of administration of the Superior Court of Los Angeles County has been at the county seat. As the growth of the population led to the creation of branches of the court, the center of administration remained unchanged and is in the geographical area which is presently designated as the Central District." (*Adams* v. *Superior Court, supra,* 27 Cal.App.3d at pp. 730-731.)

It is readily understandable why the Legislature referred in section 206 to sessions being held in "cities other than the county seat" since branch courts until 1959 were, with the single exception previously noted,[20] statutorily authorized only in specially qualified *cities.* That factor explains the prior use of the terms "wards" and "townships" in section 206.[21]

---

[19]Between December 23, 1969, and July 6, 1971, jurors for the Central District trials were drawn only from that district. (*Adams* v. *Superior Court, supra,* 27 Cal.App.3d at p. 724.)

[20]Government Code section 69744.5 was implemented only as to Lancaster. See Study, pages 3 and 4.

[21]A ward is a district or division of a city (see Black's Law Dict. (4th ed. 1951) pp. 1754-1755). The term has no current significance in California.

A township, on the other hand, is a subdivision of a county, created by the Legislature and having certain powers of local government. Townships were formerly the sites of justices' courts, but were replaced by judicial districts upon enactment of the Municipal and Justice Court Act of 1949 and a constitutional amendment in 1950. (See Const., art. VI, § 11; Gov. Code, §§ 71001-71385; 16 Cal.Jur.3d, Courts, § 15, pp. 30-31.)

However, since enactment of the comprehensive scheme for superior court districts in 1959, a court divided into such districts has been required to "hold its sessions . . . [a]t the location or locations in each superior court district specified by ordinance adopted pursuant to [Government Code sections 69640-69650]." (Gov. Code, § 69741.)

Construing together section 206 and the pertinent sections of the Government Code, we think they can be harmonized without doing violence to the intent of the Legislature. (See *Ingram* v. *Justice Court,* 69 Cal.2d 832, 839 [73 Cal.Rptr. 410, 447 P.2d 650, 36 A.L.R.3d 1391]; *Burks* v. *Poppy Construction Co.,* 57 Cal.2d 463, 470 [20 Cal.Rptr. 609, 370 P.2d 313]; 45 Cal.Jur.2d, Statutes, §§ 117 and 118, pp. 626-628, and § 121, pp. 629-630.)

"The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.] Moreover, 'every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' [Citation.] If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose. [Citation.] Such purpose will not be sacrificed to a literal construction of any part of the act." (*Select Base Materials* v. *Board of Equal.,* 51 Cal.2d 640, 645 [335 P.2d 672].)

The only sensible interpretation of section 206, we feel, is that the Legislature intended in enacting Government Code sections 69640-69650 to vest discretion in the board of supervisors and superior court as to the location of branch courts and to provide that jurors should be drawn from the residents of the superior court district in which the court is located—with the exception of the "county seat" (the Los Angeles Civic Center), in which case jurors would be drawn from the county at large.

This interpretation requires that where section 206 read "cities other than the county seat," we construe it to mean "*locations* other than the county seat." We are satisfied that this is what the Legislature meant.

Assuming that view to be erroneous, for the sake of argument only, if there was less than literal compliance with section 206, we point out that its provisions have been held to be directory only, not mandatory. (See *People* v. *Crossan, supra,* 87 Cal.App. at p. 11; *People* v. *Tennant,* 32 Cal.App.2d 1, 8 [88 P.2d 937].)

"As a general rule, errors and irregularities in failing to comply strictly with the statutes in making up a jury list, when there is no resultant prejudice to the parties involved in litigation, does not invalidate the list [citations]. A defendant cannot complain if he is tried by an impartial jury and can demand nothing more." (*People* v. *Hess,* 104 Cal.App.2d 642, 669 [234 P.2d 65].)

On the other hand, it would be anomalous if not absurd to impute to the Legislature an intent to require a county-wide draw for jurors in the largest and remotest court district solely because of the fortuity that the board of supervisors chose to locate a multi-branch courthouse facility in Van Nuys (part of the City of Los Angeles), rather than, say, in San Fernando (an incorporated city) or in Palmdale or Lancaster (unincorporated county territory). (See *Bruce* v. *Gregory,* 65 Cal.2d 666, 673-674 [56 Cal.Rptr. 265, 423 P.2d 193]; *County of Orange* v. *Heim,* 30 Cal.App.3d 694, 713 [106 Cal.Rptr. 825].)

■ We now discuss defendant's contention that the lesser percentage of black residents in the Northwest District than in the county at large deprives him of due process of law and of the equal protection of the laws.

We commence with the premise that the jury selection system must draw jurors from a fair cross-section of the community (*United States* v. *Butera* (1st Cir. 1970) 420 F.2d 564, 567), but nevertheless, "[n]either the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group." (*Swain* v. *Alabama,* 380 U.S. 202, 208 [13 L.Ed.2d 759, 766, 85 S.Ct. 824].)

We accept the principle that either a county-wide or district-wide drawing for jurors is constitutionally valid. (*Adams* v. *Superior Court, supra,* 27 Cal.App.3d at pp. 728, 730; *People* v. *Jones,* 9 Cal.3d 546, 556 [108 Cal.Rptr. 345, 510 P.2d 705].) *Adams* involved the converse of our facts—a jury challenge based on use of a county-wide, rather than district-wide, basis for selection of criminal trial jurors. Nevertheless, the reasoning of that case seems equally appropriate to the present facts: "In view of the permissible state objectives attained by the selection of jurors on a county-wide basis for the Central District and on a district-wide basis for each of the other districts of the Superior Court of Los Angeles County, under the traditional equal protection criterion the classification embodied in section 206 of the Code of Civil Procedure is constitutional because it is not palpably arbitrary but is based upon sound reasons

cognizable by the Legislature. [Citation.] But since the classification relates to the fundamental right to a trial by jurors drawn from a fair cross-section of the community, its constitutionality must be judged by the stricter standard of whether it is *necessary* to promote a *compelling* state interest. (*Shapiro* v. *Thompson,* 394 U.S. 618, 638 [22 L.Ed.2d 600, 617, 89 S.Ct. 1322]; *Purdy & Fitzpatrick* v. *State of California,* 71 Cal.2d 566, 578-579 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194].)" (*Adams* v. *Superior Court, supra,* 27 Cal.App.3d at p. 732.)

We reiterate that there is such a *"compelling* state interest": "An essential concern of the state is that there be a system for the administration of justice in criminal cases which assures a meaningful adherence to constitutional principles. The population and geographical area of Los Angeles County necessitate a system of a complex and flexible nature. Only by use of branch courts in designated districts can the superior court function in such a manner as to reasonably accommodate litigants, jurors, witnesses and other interested persons." (*Adams* v. *Superior Court, supra,* 27 Cal.App.3d at p. 732.)

The trial court did not err in rejecting defendant's challenge to the jury panel.

## IV

### DENIAL OF MOTION FOR MISTRIAL

While Sergeant Lee was testifying out of the presence of the jury, one of the jurors, a Mrs. Grau, was observed by the trial judge to enter the courtroom, at which time the testimony was interrupted until the juror had left the courtroom. The trial judge stated, "[I]t was a matter of two or three seconds between her entry into the courtroom and my interruption of Sergeant Lee." Defendant's counsel stated that Mrs. Grau entered the courtroom as Sergeant Lee was saying, "He said." Defendant speculates that Mrs. Grau "apparently could have overheard the following testimony": "SGT. LEE: He said, 'Yes,' he wore gloves. MR. WELDON: Could he locate the specific houses he mentioned or you mentioned? SGT. LEE: No. I asked him if he knew where he had been and he said no. I asked him why he didn't leave the scene."

Defense counsel's motion for a mistrial was taken under submission and thereafter counsel made a new motion for a mistrial on the ground that four more jurors, possibly six, entered the courtroom on their way

into the jury room while Sergeant Lee was on the stand. The court denied both motions.

There was no showing that Mrs. Grau actually heard any of the out-of-jury testimony of Sergeant Lee nor that any of the other jurors did; there was no request for an interview of any of the jurors to determine what, if anything, the jurors had heard; there was no request for an admonition to the jurors.

As it developed, whatever might have been heard by Mrs. Grau was later repeated in the presence of the jury.

Defendant's contention is that "whether or not the jurors heard anything, the fact that they observed Sgt. Lee testifying, prior to his continued testimony in the jury's presence, could well lead them to give extra credence to any of his testimony as having already passed some kind of scrutiny by the court." But this speculation is simply not justified by the record. We detect no abuse of discretion. (See *Warner* v. *O'Connor*, 199 Cal.App.2d 770, 776 [18 Cal.Rptr. 902]; *People* v. *Bronson*, 263 Cal.App.2d 831, 841 [70 Cal.Rptr. 162], cert. den., 394 U.S. 964 [22 L.Ed.2d 566, 89 S.Ct. 1316].)

V

RIGHT TO SPEEDY TRIAL

█ On January 22, 1974, on defendant's motion, his motion to suppress evidence (Pen. Code, § 1538.5) and trial were continued to February 14, 1974. The minutes for that date reflect that "defendant personally and all counsel waive time for trial." On February 14, 1974, the case was transferred from department NW "S" to Department NW "R" and thereafter was trailed to February 15, February 21, February 22 and ultimately February 25. On that date, the case was transferred to department NW "E," where it was ultimately tried.

On February 25, 1974, defendant's counsel moved for a dismissal of the action on the ground that the defendant had not been granted his right to a speedy trial. The basis for the motion was that "this is technically the 11th day of trailing, as the 10th day fell on a Sunday, yesterday."

The trial court denied the motion, stating that he was "excluding the weekends in the counting of the 10-day trailing period."

We take judicial notice that February 23 and 24, 1974, respectively, were a Saturday and Sunday.

Penal Code section 1382 provides in part that "[t]he court, unless good cause to the contrary is shown, must order the action to be dismissed . . . when a defendant is not brought to trial in a superior court within 60 days after the . . . filing of the information . . . except that an action shall not be dismissed under this subdivision if it is set for trial on a date beyond the 60-day period at the request of the defendant or with his consent, express or implied, . . . and if the defendant is brought to trial on a date so set for trial or within 10 days thereafter."

Code of Civil Procedure section 12a provides that "[i]f the last day for the performance of any act provided or required by law to be performed within a specified period of time shall be a holiday, then such period is hereby extended to and including the next day which is not a holiday. The term 'holiday' as used herein shall mean all day on Saturdays, all holidays specified in sections 6700 and 6701 of the Government Code and, to the extent provided in section 12b of this code, all days which . . . are required to be considered as holidays . . . ."

That "extension" provision has been held to be applicable to criminal matters, including the time limits specified in Penal Code section 1382. (See *Cody* v. *Justice Court,* 238 Cal.App.2d 275, 286 [47 Cal.Rptr. 716]; *Hill* v. *Municipal Court,* 206 Cal.App.2d 257, 260 [24 Cal.Rptr. 34]; *People* v. *Crary,* 265 Cal.App.2d 534, 542 [71 Cal.Rptr. 457].)

The trial court correctly denied defendant's motion for dismissal.

## VI

### PRIOR FELONY CONVICTION

■ Defendant's final claim of error is that the trial court abused its discretion in denying the motion made pursuant to *People* v. *Beagle,* 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], to preclude the People from making use of a prior burglary conviction of defendant for impeachment purposes should he elect to testify at the trial.

An amendment to the information alleged that defendant was convicted of burglary, a felony, on or about February 9, 1967, in the State of Missouri. On March 14, 1974, defendant admitted the truth of

the prior, waiving his privilege against self-incrimination and his rights to a jury trial and to confrontation of witnesses. Defendant and his counsel represented that there had been adequate advice as to the "possible effects" of the admission of the prior. The procedure comported with the requirements of *In re Yurko,* 10 Cal.3d 857, 863 [112 Cal.Rptr. 513, 519 P.2d 561], which had been filed only one week previously.

Thereafter the so-called *Beagle* motion was made and denied.

It was represented by defendant's counsel in oral argument that use of the prior conviction for impeachment purposes "would greatly deter my client from exercising his right to testify in his behalf." The motion was not renewed after the People had rested, nor was there any offer of proof as to what the defendant's testimony would be. (See *People* v. *Delgado,* 32 Cal.App.3d 242, 252-253 [108 Cal.Rptr. 399]; *People* v. *Wingo,* 34 Cal.App.3d 974, 981-983 [110 Cal.Rptr. 448].)

Although it is represented in defendant's brief that he "did not testify at trial as a result of the Court's ruling," the record is not so clear on that point. The sole reference we have found to the defendant not testifying is the reference in the transcript previously quoted.

Under the circumstances of this case, it might have been preferable for the trial court to have denied defendant's motion on condition that the precise nature of the prior felony not be revealed to the jury, but that observation is made from the unassailable position of appellate hindsight. However, we imply no error in the court's ruling, which we find to have been well within the bounds of its discretion as delineated in *People* v. *Beagle, supra.*

The judgment is affirmed.

Potter, Acting P. J., and Allport, J., concurred.