[Civ. No. 61770. Second Dist., Div. Three. July 9, 1981.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
MARIO MARGUERITO OROZCO et al., Real Parties in Interest.

COUNSEL

John Van de Kamp, District Attorney, Donald J. Kaplan and Eugene D. Travis, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Marcelita V. Haynes for Real Parties in Interest.

OPINION

**KLEIN, P. J.**—The People of the State of California (the People) seek a writ of mandate compelling the superior court to vacate its order in favor of Edward Gabriel Mojica (Mojica) suppressing the tape recording of a jail cell conversation on the grounds that the preceding warrantless arrests were unreasonable pursuant to Penal Code section 1538.5, subdivision (a)(1).

The People's petition was timely filed since it was brought within 30 days of the hearing in the superior court. (Pen. Code, § 1538.5, subd. (o).)

We grant the petition for the reasons discussed below.

The People's similar petition as to Mario Marguerito Orozco (Orozco) was dismissed after Orozco entered a guilty plea.

### STATEMENT OF FACTS[1]

At approximately 7:30 p.m. on the evening of April 17, 1980, Officers Brinker and Moreno of the Los Angeles Police Department (LAPD) went to the Maldonado home on Siskiyou in response to a report of a shooting. Brinker observed several expended .30 caliber carbine rounds on the street in front of the house and holes in the front bay window. The victim, Robert Maldonado (Maldonado), was rushed to the hospital.

No one in the crowd that had gathered in front of the Maldonado residence volunteered any information to the police about the shooting until approximately one hour later when word was received that Maldonado was dead. At that time, several persons in the crowd relayed the information that male Latins in a black Monte Carlo had fired shots into the Maldonado home and that the same black Monte Carlo could probably be found on the 600 block of Keenan.[2]

Before proceeding to the 600 block of Keenan, Brinker and Moreno flagged down Deputy Sheriff Dixon of the Los Angeles County Sheriff's Department. The 600 block of Keenan was in Dixon's territory and he had a greater knowledge of the people and the area than did the LAPD officers due to his long experience in the East Los Angeles station on gang detail. They gave Dixon the information they had received regarding the black Monte Carlo which might have been in-

---

[1]A plenary factual picture is necessary since the determination of probable cause must be decided in each case "... on the facts and circumstances presented to the officers at the time they were required to act." (*People* v. *Fein* (1971) 4 Cal.3d 747, 752 [94 Cal.Rptr. 607, 484 P.2d 583], and cases cited therein.)

[2]Many friends, neighbors and family members were in the crowd in front of the Maldonado home. It was not determined by the police who the informants were or if they had in fact witnessed the shooting.

volved in the homicide just a short time before. Thereafter, Dixon and the LAPD officers proceeded to the Keenan Street location.

An investigation at the Keenan location turned up no evidence. Brinker and Moreno then further informed Dixon that the shooting victim was Maldonado and that the homicide had occurred at the Maldonado home when shots were fired into the house from the street.[3] He was also told what type and caliber weapon had been used.

Dixon's familiarity with East Los Angeles gangs and knowledge of certain facts surrounding the relationship between the victim's son, Leonard "Muskie" Maldonado (Muskie), and Orozco aroused his suspicions. He knew Orozco to be a member of the Lote gang, the arch rivals of the Marianas, the gang to which Muskie belonged. Muskie had been charged with the killing of Orozco's brother and was free on bail, living at the Maldonado home, and was present in the home taking a shower at the time of the drive-by shooting. At the preliminary hearing for the murder of Orozco's brother, Dixon had overheard Orozco tell a member of the Mariana gang that the killing of his brother "was of a personal nature" and that "it wasn't going to end there, that he was personally going to take care of it . . . ."

Dixon was also aware that Mojica, a close associate of Orozco and also a member of the Lote gang, owned and drove a black Monte Carlo. He also knew that gang warfare had heated up since the slaying of Orozco's brother and that the Lote and Mariana gangs in particular were at war and had been involved in a series of drive-by shootings. He was aware that the Mojica residence was a hangout for the Lote gang and therefore felt that the residence warranted investigation.

Dixon exchanged all this information with Brinker and the other LAPD officers.

As Dixon drove up to the Mojica home and came to a stop, the six male Latins who had been standing in the front yard split up and began moving away from him in all different directions. Two of the men, Orozco and Mojica, quickly retreated into the house. This conduct was uncommon, since the members of the Lote gang had had a good rapport

---

[3]According to Dixon, this "drive-by" shooting is typical of gang related violence in the East Los Angeles area.

with Dixon, and when he drove by the Mojica home they usually came up to his patrol car and talked with him.[4]

Shortly thereafter, other sheriff and LAPD units arrived at the scene. Orozco and Mojica were still inside the house. Dixon had to "shimmy by" (*sic*) the black Monte Carlo in order to get to the rear of the house. As he did so, the inside of the car was illuminated by his flashlight and he observed in the rear floorboard area what appeared to be expended .30 caliber rounds, the same caliber as had been used in the killing of Maldonado earlier that evening, but he did not see the murder weapon itself.[5] Dixon pointed out his observations to the LAPD officers. As Dixon believed the two would attempt to exit the rear of the house and flee, the officers surrounded the house and Mojica and Orozco were ordered to exit. When Mojica and Orozco came out of the house, Brinker arrested them.

Orozco and Mojica were booked at Parker Center on charges of murder (Pen. Code, § 187), after which the tape recording system was turned on in the jail cells and recordings were made of alleged conversations between Orozco and Mojica.

## CONTENTION

The People contend that the trial court erred in granting Mojica's motion to suppress his tape-recorded statements as "fruit of the poisoned tree"[6] after its finding that there was not sufficient probable cause to arrest Mojica.

## DISCUSSION

As the trial court in the instant case suppressed Mojica's tape-recorded statements on "the sole ground [of] the illegality of the arrest and if

---

[4]Dixon testified that over the years he has driven to the Mojica residence between 30 and 50 times. He had in fact been there the previous night, at which time Mojica came out to the car and conversed with him.

[5]A rifle was later found in the back yard of Mojica's residence.

[6](*People v. Superior Court (Casebeer)* (1969) 71 Cal.2d 265, 269 [78 Cal.Rptr. 210, 455 P.2d 146]; *Wong Sun v. United States* (1963) 371 U.S. 471, 484-485 [9 L.Ed.2d 441, 452-454, 83 S.Ct. 407]; *People v. Lathrop* (1979) 99 Cal.App.3d 967, 972-973 [160 Cal.Rptr. 654].)

it had been a legal arrest ... the tapes [would have been] all right," expressly affirming its belief in the credibility of the officers' testimony, the sole question presented by this petition is whether the People have sustained their burden of showing that there was probable cause for Mojica's arrest. (*Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 67 [27 Cal.Rptr. 889, 378 P.2d 113]; *Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23].)

■ Under Penal Code section 836, subdivision 3, an officer may make a warrantless arrest if he has reasonable cause to believe the person to be arrested has committed a felony. The applicable principles governing the existence of probable cause were stated by our Supreme Court in *People* v. *Ingle* (1960) 53 Cal.2d 407, 412-413 [2 Cal.Rptr. 14, 348 P.2d 577]: "Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.... Probable cause has also been defined as having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt. It is not limited to evidence that would be admissible at trial on the issue of guilt. The test is not whether the evidence upon which the officer acts in making the arrest is sufficient to convict but only whether the person should stand trial." (See also *People* v. *Moore* (1970) 13 Cal.App.3d 424, 436 [91 Cal.Rptr. 538].)

Under these guidelines each case must be decided on its own facts and the totality of the ambient circumstances presented to the officers at the time they were required to act. (*People* v. *Fein, supra,* 4 Cal.3d 747, 752; *People* v. *Terry* (1970) 2 Cal.3d 362, 393 [85 Cal.Rptr. 409, 466 P.2d 961].) To justify the intrusion as a reasonable one, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (*Terry* v. *Ohio* (1968) 392 U.S. 1, 21 [20 L.Ed.2d 889, 906, 88 S.Ct. 1868].)

■ When the decision of the trial court to exercise its power to suppress evidence is challenged by an extraordinary writ, "it becomes the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness." (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].)

The experience and knowledge of a police officer in his field of expertise has long been acknowledged as an important factor in the determination of whether probable cause existed for an arrest. (*Wimberly v. Superior Court* (1976) 16 Cal.3d 557, 565 [128 Cal.Rptr. 641, 547 P.2d 417]; *People v. Medina* (1972) 7 Cal.3d 30, 37 [101 Cal.Rptr. 521, 496 P.2d 433]; *People v. Superior Court* (*Kiefer*) (1970) 3 Cal.3d 807, 827 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559].) "The rule requiring probable cause 'should not be understood as placing the ordinary man of ordinary care and prudence and the officer experienced in [a particular type of criminal activity] in the same class. Circumstances and conduct which would not excite the suspicion of the man on the street might be highly significant to an officer who had had extensive training and experience [in the area.]'" (*People v. Medina, supra*, 7 Cal.3d 30, 37; *People v. Williams* (1961) 196 Cal.App.2d 726, 728 [16 Cal.Rptr. 836].) Indeed, "'[e]xperienced police officers naturally develop an ability to perceive the unusual and suspicious which is of enormous value in the difficult tasks of protecting the security and safety of law-abiding citizens. The benefit thereof should not be lost because the cold record before a reviewing court does not contain all the particularized perceptions which may have been so meaningful at the scene.'" (*People v. Gale* (1973) 9 Cal.3d 788, 795-796 [108 Cal. Rptr. 852, 511 P.2d 1204], quoting *People v. Cowman* (1963) 223 Cal.App.2d 109, 117-118 [35 Cal.Rptr. 528].)

Most of the cases holding that judicial determination of the existence of probable cause for an arrest may include in large part the expertise of a police officer deal with narcotic violations. (See *People v. Rich* (1977) 72 Cal.App.3d 115, 121 [139 Cal.Rptr. 819], and cases cited therein.) However, it stands to reason that consideration of police officer expertise on the issue of probable cause for an arrest should not be limited to criminal activity solely involving narcotics.

In the case before us we see an example of expertise in the area of gang activity. Unquestionably Dixon was an expert in gang behavior. He had been assigned to the sheriff's gang detail for four years and had been working out of the East Los Angeles sheriff's station for six years, during which time he had had extensive contact and conversations with gang members. He had been qualified a number of times as a court expert on gang activity.

In the instant fact situation, Dixon shared the crucial information that was the subject of his expertise with the other LAPD officers at the scene of the arrest, including Brinker, who actually effected the

arrest. ■ Since both Dixon and Brinker testified as witnesses at the evidence suppression hearing conducted by the trial court pursuant to Penal Code section 1538.5, there was no violation of the principle enunciated in *Remers* v. *Superior Court* (1970) 2 Cal.3d 659, 666 [87 Cal. Rptr. 202, 470 P.2d 11].

*Remers* held "... while it may be perfectly reasonable for officers in the field to make arrests on the basis of information furnished to them by other officers, 'when it comes to justifying the total police activity in a court, the People must prove that the source of the information is something other than the imagination of an officer who does not become a witness.' [Citations.]" (*Ibid.*) As in *People* v. *Taylor* (1975) 46 Cal.App.3d 513, 523 [120 Cal.Rptr. 762], disapproved on other grounds in *People* v. *Rollo* (1977) 20 Cal.3d 109, 120, fn. 4 [141 Cal. Rptr. 177, 569 P.2d 771], we are satisfied that the requirements of *Remers* were met. (See *People* v. *Wright* (1977) 72 Cal.App.3d 328, 342-343 [140 Cal.Rptr. 98].)

■ At the time of the arrest the following circumstances were known to the officers, including Brinker: (1) Muskie, the probable intended victim, was the suspected killer of Orozco's brother and was living at the home of his father; (2) Orozco had threatened to personally avenge his brother's death; (3) Maldonado was the unintended victim of the drive-by shooting herein; (4) anonymous informers had implicated male Latins driving a black Monte Carlo in the shooting;[7] (5) Mojica owned a black Monte Carlo; (6) Mojica and Orozco were close associates and were both members of the Lote gang, which gang congregated at Mojica's residence; (7) the Lote gang was involved in intensified warfare, including many drive-by shootings, with the Mariana gang to which Muskie belonged; (8) when an officer with whom they previously had had a good rapport drove up, Orozco and Mojica uncharacteristically retreated into the house; (9) shells which were believed to be of the same caliber as those used in the shooting of Maldonado a few hours earlier were seen in plain view in Mojica's black Monte Carlo, and (10) the weapon involved in the shooting was still outstanding.

---

[7]On the limited issue of probable cause to justify an arrest, an officer may rely on an informant's statements if corroborated by independently established facts even if that evidence is inadmissible on the issue of guilt at trial. (*People* v. *Lara* (1967) 67 Cal.2d 365, 374-375 [62 Cal.Rptr. 586, 432 P.2d 202]; *People* v. *Turnage* (1975) 45 Cal. App.3d 201 [119 Cal.Rptr. 237]; *Curry* v. *Superior Court* (1970) 7 Cal.App.3d 836 [86 Cal.Rptr. 844].)

In assessing probable cause to arrest without a warrant, an officer's subjective beliefs must be measured by objective standards. (*People v. Miller* (1972) 7 Cal.3d 219, 226 [101 Cal.Rptr. 860, 496 P.2d 1228].) When circumstances combine into a reasonable belief that the suspects were involved in a felony, a warrantless arrest is not unlawful. (*People v. Kilpatrick* (1980) 105 Cal.App.3d 401, 410 [164 Cal.Rptr. 349].)

As we have noted, Brinker was fully apprised of all the facts and circumstances known to Dixon at the time he arrested Mojica. When objectively considered, these facts and circumstances combined to provide probable cause for Mojica's arrest.

In addition, the fact situation herein presents a case wherein exigent circumstances justified the warrantless arrest of Mojica. ▮ "'Exigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious danger to property, or to forestall the imminent escape of a suspect or destruction of evidence ... and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (*People v. Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333].)

Here, a violent homicide had been committed a few hours before the officers confronted the suspects. The weapon had not been recovered and Muskie, the probable intended victim of the shooting, was alive and in the immediate vicinity. The suspects fled from the officers into the house.

Under these circumstances, the facts were such that the officers reasonably could have concluded that the life of Muskie was in jeopardy as long as Mojica and Orozco remained at large. Also, the murder weapon could have been destroyed or irretrievably secreted had the officers taken the time to secure an arrest warrant. Thus, the officers were justified in ordering Orozco and Mojica out of the house and making the warrantless arrests.

The petition is granted.

Cobey, J., and Potter, J., concurred.

A petition for a rehearing was denied August 7, 1981.