[Civ. No. 65444. Second Dist., Div. Five. Oct. 28, 1982.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
FREDERICK DORTAN PRICE, Real Party in Interest.

COUNSEL

John K. Van de Kamp, District Attorney, Donald J. Kaplan and Arnold T. Guminski, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Ronald V. Skyers for Real Party in Interest.

OPINION

**FEINERMAN, P. J.**—The People, pursuant to Penal Code section 1538.5, subdivision (o), seek a writ of mandate directing respondent superior court to vacate an order suppressing statements made by real party and photographs

taken of him while he was in police custody. We issued an alternative writ and set the matter for hearing. We have concluded that the People are entitled to the writ they seek.

Real party is charged with one count of murder and one count of attempted murder. The offenses were committed in the course of a street gang drive-by shooting. It is in that context that we must assess the reasonableness of the police conduct which led to the evidence which respondent court suppressed.

The evidence adduced at the hearing on the motion to suppress was as follows:[1] The shooting occurred at about 4:10 p.m. at 112th and Broadway. Witnesses at the scene (who were amongst those shot at, but not hit) described the assailants as members of the Miller Gangsters. Miller Gangsters is identified in the record as a "blood gang." "Blood gangs" are described as rivals of the various Crips gangs. The victims of the subject shooting were members of a Crips affiliate which was frequently at war with the Miller Gangsters.

The assailants were riding in a white Toyota Celica hatchback. The shooting occurred through the open rear hatch. There were four or five young men in the car. Some witnesses thought that only two or three did the shooting; one thought as many as four had guns. Some of the car's occupants were wearing red clothing. One of the shooters wore dark clothing. One wore a cap with the letters MG on it, identifying the wearer as a Miller Gangster.

Randolph, one of the victims who was shot at but not hit, in talking to some of the officers at the scene, identified one of the shooters as a fellow known as Bolo. Another of the occupants of the car was described as light skinned with sandy hair. This information was significant to Los Angeles Police Department Officer Hodges, one of the officers at the scene. Hodges was assigned to a gang detail at the 77th Street Station. He was familiar with gang activity in the south central Los Angeles area. Miller Gangsters was a Black gang; however, Hodges knew an Emilio Lopez, aka Cheese, who was of Cuban descent, who was light skinned and sandy haired, and who ran with the Miller Gangsters. Lopez was the only light complected blood gang member known to Hodges.

Hodges believed the eyewitnesses' identification of the assailants as Miller Gangsters was accurate because he had learned through experience that gang members were extremely knowledgeable as to the identities of rival gang members and that "they're one of your better witnesses in a gang shooting."

[1]Respondent resolved all factual issues, save one, in the People's favor. The factual statement reflects those findings. (*People* v. *Johnson* (1980) 26 Cal.3d 557 [162 Cal.Rptr. 431, 606 P.2d 738].)

The investigation at the scene continued past 7 p.m. At about that time a radio communique advised the officers at the scene that a white Celica hatchback had been found abandoned at 103d and Figueroa. There were shell casings in the car, and it had been reported stolen.

At about the same time another radio communique was received at the scene advising of a "disturbing the peace, shots fired" incident at 120th and San Pedro. Officer Hodges went to that location. There he found two men in custody, one of whom (Wardlow) identified himself as an East Coast Crip and stated that five or six "bloods," wearing red colors were proceeding east on 120th. One was on a bicycle. The rest were on foot. An anonymous woman at the location told Hodges that she was afraid and did not want to get involved, but that she had seen a group of five or six Miller Gangsters walking east on 120th Street. Some of them had guns. She also mentioned their red clothing. She identified one of the group as the light skinned "Cheese."

Hodges knew that the Miller Gangsters' territory was the 900 block of East 120th Street, an area east of 120th and San Pedro. Based upon his familiarity with the territories of the various gangs in the area and his experience with the behavior of gang members, Hodges believed that if the group of Miller Gangsters involved in the shooting had abandoned the vehicle at 103d and Figueroa, and were on foot, they would have attempted to return to their own neighborhood by a route which avoided the territories of rival and hostile gangs. He concluded that the most logical route for them to have followed consistent with that objective would have been to walk south on Figueroa all the way to 120th Street and then proceed east to their own territory. Such a route would have taken them through the territories of other friendly gangs except for the short distance around San Pedro where they had to traverse East Coast Crip territory. Hodges believed that the route which he postulated would have brought them to the area of 120th and San Pedro at about the time of the shooting incident at that location.

Hodges drove to the 900 block of East 120th Street. There he found several young black males, some of whom were wearing red clothing and dangling red handkerchieves from their back pockets. Wearing red in this fashion was common practice for Miller Gangsters during shooting raids, but not otherwise.

Real party was in the group on East 120th Street. He was wearing a red plaid shirt and a black cap. Hodges and his partner commenced an investigation and attempted to complete field identification cards on the individuals. Hodges asked one fellow his name and was told it was Robert Smith. Hodges then asked real party his name. Real party identified himself as Frederick Price. Hodges went back to "Robert Smith" and again asked his name. This time he was told it was James Smith. Hodges then asked real party if he knew "Smith." Real

party identified him as James Crawford, alias Bolo. (At this point in time Hodges did not know that Bolo had been identified as one of the assailants.) One of the other persons Hodges found at the scene identified himself as Charles Topps, but Hodges knew him as Charles Jennings from a prior arrest. Hodges was not familiar with real party and did not know if he had correctly identified himself or not.

Hodges felt that a group of four young men, which included real party, who were congregating together, stood out as gang members. Upon hearing the name discrepancies, and taking into consideration the other information he had compiled in the course of his investigation, Hodges formed the opinion that they were quite likely suspects in the murder and assault at 112th and Broadway. Hodges knew that the crime scene had been cleared of witnesses by that time. He decided to take four suspects—real party, Bolo, Jennings (Topps) and one Bates—to 77th Street Station to confirm their identities, if possible, through the gang files located there. He also wanted to get off the street out of fear for his safety because of the potential danger of a retaliatory drive-by shooting, because a crowd was forming, and because officers had previously been shot at and attacked with thrown bottles at that particular location. The suspects were transported to 77th Street Station, handcuffed for the officers' safety.

As soon as they arrived at 77th Street, Hodges received a call from Detectives Wilder and Tapley, who were at Southeast Station where the homicide investigation was continuing. They asked if Hodges had anything in his files on a Bolo and told him that Bolo had been identified as one of the murder suspects. Hodges said that he had Bolo at 77th Street along with three other suspects. Wilder asked Hodges to bring all four suspects to Southeast. Hodges immediately did so.

Hodges had confronted the suspects on 120th Street at about 7:30 p.m. He arrived at 77th Street with them at about 7:45 p.m., and arrived at Southeast with them at about 8 p.m. Eyewitnesses to the murder were still at Southeast being interviewed. As soon as the suspects arrived at Southeast, they were photographed by the investigating officers at Southeast. A gunshot residue test was also performed on real party to determine if he had recently fired a weapon. The results were inconclusive.

The suspects, who were all juveniles, were asked how their parents could be contacted so that they could be notified of the suspects' whereabouts. Real party gave two phone numbers for his mother. The numbers were called but the persons who answered stated that she was unknown to them. Real party was asked for an address at which his mother could be located but he did not provide one.

Shortly after the arrival of the group at Southeast, Officer Hodges learned from one of the suspects that Lopez (Cheese) had been hiding in the bushes when the officer first found the suspects on 120th Street.

After photographing the suspects and trying unsuccessfully to contact real party's mother, Detective Wilder (who had taken charge of the investigation) and several of his colleagues resumed interviewing the eyewitnesses. Other officers compiled four separate photographic lineups—one of each of the suspects. Randolph, the eyewitness who had earlier named Bolo as one of the assailants, identified Bolo's photograph. The officers could not remember at the hearing on the motion to suppress if photographs of the other three suspects were shown to Randolph on the night of the homicide. Randolph identified real party's photo shortly before the hearing commenced on real party's motion to suppress.

Wilder completed taking Randolph's statement at about 11 p.m. Immediately thereafter he started interviewing real party, after first informing him of his constitutional rights. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) Real party waived his rights and spoke to Wilder. He claimed that he had been with two females at 116th and Avalon and that he saw Bolo at that location from about 3:30 to 4 p.m. He claimed to have heard that someone named Grayline had shot some people at 112th and Broadway. Wilder finished taking real party's statement at about 11:20 p.m. He then went back to his investigatory activities, attempting to corroborate the various witnesses' statements. Real party, who was not then handcuffed, remained in an interview room which was adjacent to the room in which Wilder was working. At about 1 a.m. real party pounded on the door of Wilder's room and said that he wanted to talk to the officer. After again being *Mirandized,* real party admitted participating in the shooting and named others who had been with him. He stated that he had fired in the direction of the people at 112th and Broadway, but that he had intended to fire over a building.

Hodges considered the suspects merely detained when he transported them to 77th Street. Both he and Wilder regarded them as under arrest when they arrived at Southeast.

Following the shooting and prior to the conclusion of the investigation at the scene of the crime, some 53 officers reported to the location. The information derived there from interviews with witnesses was pooled and shared by officers during the course of the investigation. Hodges, Wilder and one other officer testified at the hearing on the motion to suppress, as did Randolph and one other eyewitness who had been shot at and missed. Respondent correctly found that the People had met their burden of proving that the source of information upon which the police relied, when they detained real party, was something other

than the imagination of a nontestifying witness. (*Remers* v. *Superior Court* (1970) 2 Cal.3d 659, 666 [87 Cal.Rptr. 202, 470 P.2d 11].) Respondent also correctly found that the officers had probable cause to detain real party and the other suspects on 120th Street and that the factual setting justified their being transported first to 77th Street Station and then to Southeast Station for investigation. (*People* v. *Harris* (1975) 15 Cal.3d 384 [124 Cal.Rptr. 536, 540 P.2d 632]; *People* v. *Courtney* (1970) 11 Cal.App.3d 1185 [90 Cal.Rptr. 370].) Respondent concluded, however, that the mere fact that real party was in Bolo's company did not give Hodges probable cause to arrest real party after Bolo was identified, and further ruled that once real party was taken to Southeast he was unreasonably detained for a period of time which could not be justified by any investigative effort directed specifically toward him. We do not agree with these latter conclusions.

█ Probable cause for arrest ". . . has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. [Citations.] Probable cause has also been defined as having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt. [Citations.] It is not limited to evidence that would be admissible at the trial on the issue of guilt. [Citations.] The test is not whether the evidence upon which the officer acts in making the arrest is sufficient to convict but only whether the person should stand trial. [Citation.]" (*People* v. *Ingle* (1960) 53 Cal.2d 407, 412-413 [2 Cal.Rptr. 14, 348 P.2d 577].) In assessing the reasonableness of an officer's conduct the courts will give considerable weight to the officer's particular expertise gained through on the job experience. (*People* v. *Gale* (1973) 9 Cal.3d 788, 795-796 [108 Cal.Rptr. 852, 511 P.2d 1204].) Officer expertise in the field of street gang activities has been duly credited as a factor contributing to the existence of probable cause for arrest in a street gang drive-by shooting. (*People* v. *Superior Court* (*Orozco*) (1981) 121 Cal.App.3d 395 [175 Cal.Rptr. 322].)

█ Hodges did not base his arrest of real party merely on the fact that he was found in Bolo's company some three hours after the shooting. Rather he relied on a whole series of events which, when analyzed in the context of the officer's expertise, strongly pointed to real party's complicity. Upon conducting his investigation at the homicide scene, then learning about the abandoned car and about the disturbing the peace, shots fired incident, and based upon his knowledge of gang locations and rivalries, Hodges postulated the theory that the gang members who committed the homicide had abandoned the car and were proceeding back to their home turf on foot via a particular route. His learning that "Cheese" was a member of the group at 120th and San Pedro, lent added credence to Hodge's hypothesis, as did finding real party and the other suspects back on their home turf flying their colors—something they typically

did only when engaged in warfare activities. The fact that at least two of the four suspects gave false names to the officer connoted consciousness of guilt. When Hodges learned that Bolo had been identified as one of the assailants by an eyewitness-victim, it sufficiently confirmed his theory to create the state of mind necessary to constitute probable cause as defined in *People* v. *Ingle, supra,* 53 Cal.2d 407, 412-413, not merely as to Bolo, but as to the group he was with.

The reasonableness of Hodges' conduct must be determined in the light of the total circumstances existent that evening. Even if no single fact met the test for reasonable cause, the totality of the information available to the officer from a number of independent sources was sufficient, both qualitatively and quantitatively, to satisfy the criteria for probable cause as delineated in *Ingle.* "In adopting a Gestaltist approach in this area, courts are not being innovative; they are merely accepting the fact that straight line measurements (i.e., weighing each individual factor separately) may not always provide the proper answers. Both the psychologist who studies human behavior, and the policeman who deals with problems on his beat, have learned that the ultimate configuration or structure that evolves from total experience is not necessarily the simple total of its constituent parts." (*People* v. *Superior Court (Burton)* (1969) 274 Cal.App.2d 7, 11 [78 Cal.Rptr. 757].)

If Hodges had harbored any lingering doubts, they would have been dispelled upon his learning from one of the suspects, shortly after arriving at Southeast, that the distinctive looking Cheese had been hiding in the bushes on 120th Street when the four suspects were taken into custody, thus further verifying that the group had been together at the time of the homicide and had stayed together thereafter. Probable cause to arrest would clearly have existed at that moment, which was prior to the taking of real party's statement and approximately contemporaneous with the taking of his photograph.

Furthermore, even if respondent had been correct in concluding that probable cause to arrest was lacking when real party was transported to Southeast, we would not agree with the conclusion that the detention was unreasonably prolonged. Real party was not ignored after his arrival at Southeast. He was photographed for purposes of assembling a photographic lineup. Tests were conducted to determine if he had fired a gun. Efforts were made to contact his mother. It was not unreasonable for officers to complete interviews with the eyewitnesses before interviewing real party. The prospect of an interview with real party proving fruitful, either to implicate or clear him, was far more likely if the officers embarked upon it after they had learned all they could from eyewitnesses.

The investigation which continued at the station prior to the interview with real party enabled the police to exonerate Bates. He was released to his parents at approximately 11 p.m., thereby demonstrating that the officers were not merely letting the suspects cool their heels at the station, but were conducting a focused investigation.

It might have presented a cleaner record had the officers shown—or remembered showing—real party's photographic lineup to the eyewitnesses. Had that happened, however, and had the witnesses been unable to identify real party, the officers would still have been warranted in seeking to interview him before releasing him.

Furthermore, in light of the officers' knowledge of the frequency of retaliatory gang shootings, of their inability to contact real party's mother, and of the lateness of the hour, it would have been highly irresponsible for the officers to have simply released real party back on the street without first interviewing him. In the statement taken at 11 p.m., real party placed himself in Bolo's company some 10 minutes prior to the shooting and admitted knowing that the incident had taken place. The extreme unlikelihood that between 4 and 4:10 p.m., Bolo left real party at 116th and Avalon, met the other gang members, drove to 112th and Broadway, committed the homicide and then rejoined real party just minutes before their detention by Hodges, cast grave doubts on the credibility of the exculpatory portion of real party's statement and would have warranted his arrest at the time of his first statement to Wilder, if probable cause had not existed earlier.

Let a peremptory writ of mandate issue directing respondent court to vacate that portion of its order of April 23, 1982, granting real party's motion to suppress the photographs of real party taken on June 23, 1981, and the statements made by him while in custody on the night of June 23-24, 1981, and enter a new and different order denying petitioner's motion to suppress those items.

Ashby, J., and Hastings, J., concurred.

The petition of real party in interest for a hearing by the Supreme Court was denied December 22, 1982.