[No. B014428. Second Dist., Div. Five. June 12, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
ARTURO ROSALES et al., Defendants and Appellants.

[Opinion certified for partial publication.*]

---

*Only the introductory portions of this opinion, the Factual Summary and part I of the Discussion are certified for publication. (Cal. Rules of Court, rule 976.1(a).)

## COUNSEL

Joseph F. Walsh and Dennis L. Cava, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Mark Alan Hart and Alison Braun, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

EPSTEIN, J.* —Arturo Rosales and Thomas Mayfield appeal from judgments of conviction imposed in their joint trial for murder, conspiracy to murder and attempted murder. Each was convicted of one count of murder, one count of conspiracy to commit murder, and three counts of assault with a deadly weapon (a lesser included offense of attempted murder), all with Penal Code section 12022, subdivision (a) enhancements. Rosales, whose sentence also was enhanced by two serious-felony prior convictions (Pen. Code, § 667), was sentenced to state prison for 32 years to life. Mayfield was sentenced to state prison for 22 years to life.

Both defendants argue that the prosecutor committed prejudicial misconduct in questioning a witness and in closing argument. Each presents a separate claim of error in sentencing. Rosales also argues that the trial court erred in denying a pretrial suppression motion, in finding corroboration for

---

* Assigned by the Chairperson of the Judicial Council.

the testimony of an accomplice, and in refusing to instruct on a lesser included offense.

One of the two prior convictions suffered by Rosales in Texas is not available as a serious-felony enhancement, but the other is a proper basis for enhancement; the judgment as to Rosales will be modified accordingly. We also agree that the abstract of judgment as to Mayfield must be modified to accurately reflect his credit entitlement. We will affirm the judgments in every other respect.

## FACTUAL SUMMARY

In reviewing the record on appeal, we must regard all factual disputes in the evidence to have been resolved in favor of the judgments. (See *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal. Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L Ed 2d 560, 573, 99 S. Ct. 2781].) We present a general summary at this point, reserving a fuller discussion of particular facts for our treatment of the issues to which they pertain.

South Los[1] and Elm Street are two rival gangs operating in the South Gate and Gardena areas of Los Angeles County. Two of the victims in this case, Albert Estrada and Robert Gutierrez, were members of the South Los gang. They lived with the other two victims, Leticia and Rosa Hernandez (sisters), at the home of George Hernandez on Indiana Avenue in South Gate.

Most of the other principals in the case were members of the Elm Street gang. That gang had sponsored a dance in Gardena on August 27, 1983, which apparently was attended by members of both gangs. A fight broke out toward the end of the evening. Members of the Elm Street gang held South Los responsible for the fight, and relations between the two groups were tense.

The next day, three members of the Elm Street gang visited George Hernandez at his home.[2] They told him of the shooting at the dance, that they knew Estrada and Gutierrez were living there, and that they had better move to a new location.

The record does not reveal whether this warning was transmitted to Estrada or Gutierrez; however, the record indicates they were still living at

---

[1] So called in the record. Apparently, the full name of the gang is South Los Picos.

[2] Neither defendant was among this group.

the Hernandez residence on August 30, 1983, when the criminal assaults at issue in this case occurred.

Defendants were together that evening at Rosales's home with two women. Both men were members of the Elm Street gang, and one of them asked Darrin Montalvo to come over. When he arrived, Mayfield claimed to have been stabbed at the dance, and said that he was seeking revenge. The three men and two women got into Montalvo's blue Camaro and drove to the neighborhood of the Hernandez residence.

They arrived in the neighborhood at about 10 p.m., just as Estrada, Gutierrez and the Hernandez sisters were driving home. The cars passed in opposite directions. Mayfield identified Estrada as a member of the South Los gang, and directed Montalvo to stop his car, and put it into reverse in an effort to catch up with the other car. Montalvo tried to comply, but the maneuver was unsuccessful.

At Rosales's suggestion, they then drove to Eva Ortega's apartment. Ms. Ortega's boyfriend, Javier Rodriguez, was at the apartment. He, too, was a member of the Elm Street gang. After a short conversation between Mayfield and Rodriguez, the four men (defendants Mayfield and Rosales, and Rodriguez and Montalvo) drove to Rodriguez's home. Rodriguez went inside and returned with a shotgun and shells, which he gave to Rosales. Rosales loaded the shotgun, and climbed into the bed of a black pickup truck owned by Rodriguez. The other three were seated in the cab, with Rodriguez driving, Mayfield sitting on the right passenger side, and Montalvo in the middle.

As they drove off, Mayfield told Rosales that he would "give you the signal when to fire."

The black pickup slowed as it approached the Hernandez residence. As it did, Mayfield told Rosales to "[g]o for it. Fire." Rosales fired the shotgun and reported, "I think I hit 'em."

He had shot Rosa Hernandez in the abdomen, inflicting a fatal wound. Estrada was hit in the left calf. Leticia Hernandez and Albert Gutierrez were not injured.

The four men went to a woman's house, then left that location, proceeding on 93d Street, where they saw a Highway Patrol vehicle. Rodriguez stopped the pickup, and asked everyone to get out. The others did so, Rosales taking the shotgun with him.

In the meantime, South Gate police had responded to the shooting. Leticia told one of the interrogating officers that she recognized the black pickup truck as looking exactly like a vehicle owned by a member of the Elm Street gang named Shorty. ("Shorty" is the nickname of Javier Rodriguez, who owned the pickup.) A radio bulletin was put out for the vehicle.

The Highway Patrol officers had stopped the truck about 11:45 p.m. for equipment violations, and they identified it as the vehicle described in the radio bulletin.

The officers found spent shell casings in the bed of the truck. The truck was impounded. Later, it was identified by Leticia Hernandez as the vehicle used in the drive-by shooting. Still later, a series of latent fingerprints was removed. These fingerprints matched prints from Montalvo, Rodriguez, Mayfield and Rosales.

Montalvo fled to Mexico the next day. He turned himself in to the police some three weeks later. He originally was arrested for murder, but the juvenile delinquency proceeding against him was later resolved when he admitted having committed an act of voluntary manslaughter. He was placed on summary probation, and was promised that he would receive no further punishment in the case if he testified truthfully.

Mayfield, Rosales and Rodriguez were arrested on the day after the shooting. Rodriguez's case is not before us, and Mayfield raises no issue about his arrest. Rosales, however, argues that the police lacked probable cause to arrest him, and that the fingerprint evidence obtained as a result of the arrest must be suppressed.

## DISCUSSION

### I. *Motion to Suppress*

Rosales was arrested without a warrant. The only product of the arrest that was used against him at trial is a set of fingerprints taken during the booking process. Rosales moved to suppress all fingerprint evidence on the ground that the arrest was not supported by probable cause to justify a strong suspicion of culpability in the shooting. The People argued that the arrest was supported by sufficient probable cause and that, even if it were not, the fingerprint linkage would inevitably have been discovered. The trial court denied the motion to suppress. We affirm the trial court's ruling.

#### A. *Probable Cause*

■ It is the general rule that the evidentiary fruits of an illegal arrest must be suppressed upon the proper application of the arrested person. (See

*Davis* v. *Mississippi* (1969) 394 U.S. 721, 723-724 [22 L. Ed. ed 676, 678-679, 89 S. CT. 1394]; *Hayes* v. *Florida* (1985) 470 U.S. 811, 816 [84 L. Ed. 2d 705, 710-711, 105 S. Ct. 1643];[3] *Wong Sun* v. *United States* (1963) 371 U.S. 471, 487-488 [9 L. Ed. 2d 441, 455-456, 83 S. Ct. 407].)

■ A warrantless arrest is authorized and legal "[w]henever [the arresting officer] has reasonable cause to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed." (Pen. Code, § 836, subd. 3.) *People* v. *Ingle* (1960) 53 Cal.2d 407 provides a classic statement of the governing rule: "Reasonable or probable cause for an arrest has been the subject of much judicial scrutiny and decision. There is no exact formula for the determination of reasonableness. Each case must be decided on its own facts and circumstances [citations]—and on the total atmosphere of the case. [Citations.] Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. [Citations.] Probable cause has also been defined as having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt. [Citations.] It is not limited to evidence that would be admissible at the trial on the issue of guilt. [Citation.] The test is not whether the evidence upon which the officer acts in making the arrest is sufficient to convict but only whether the person should stand trial. [Citation.]" (*Id.* at pp. 412-413.)

The reasonableness of the officer's subjective belief is tested by an objective standard. (See *People* v. *Miller* (1972) 7 Cal.3d 219, 226 [101 Cal. Rptr. 860, 496 P.2d 1228]; *Agar* v. *Superior Court* (1971) 21 Cal.App.3d 24, 28-29 [98 Cal. Rptr. 148].) That standard cannot be applied with mathematical precision, or according to a set formula. Instead, "each case must be decided on the *totality of facts and circumstances* at the time an arrest is made." (*People* v. *Superior Court* (*Holquin*) (1977) 72 Cal.App.3d 591, 594 [140 Cal. Rptr. 234], italics added; *People* v. *Superior Court* (*Price*) (1982) 137 Cal.App.3d 90, 97 [186 Cal. Rptr.734].)

We examine the probable cause issue in this case with these principles in mind.

Rosales was arrested at his home by Detective Robert Mayer, of the South Gate Police Department. Detective Mayer was especially knowledge-

---

[3] *Hayes* follows *Davis* and suggests that a field detention for fingerprints may be justified on less than probable cause for an arrest, and that the Fourth Amendment may permit a seizure warrant on less than probable cause for the limited purpose of taking a subject to a police station to be fingerprinted. (470 U.S. at p. 816 [84 L. Ed. 2d at pp.710-711].)

able about gangs operating in the area of his department, including the two gangs involved in this case. He had all of the information that had been given to the investigating officers by the victims of the shooting. He therefore knew that the shooting was probably perpetrated by members of the Elm Street gang who were seeking revenge against members of the South Los gang for the fracas at the dance in Gardena a few nights before. He also knew that members of the Elm Street gang were aware of the fact that two South Los members were living at the Hernandez residence on Indiana Street.

Detective Mayer also listened to a tape recording of an anonymous telephone call received at the South Gate Police Department on the morning after the shooting. The caller mentioned she had been inside "the house at the time of the shooting, that being the house on Indiana," i.e., the Hernandez residence. Continuing, the caller said that Rodriguez (who, at that time, was the only person under arrest) was not the only one involved. She said that Mayfield and Big Tudy (Rosales's nickname) also were involved, Big Tudy was the shooter, both were members of the Elm Street gang, and Big Tudy lived on Iowa Street. Because she knew both Mayfield and Big Tudy, she feared she would be in a "lot of trouble" with them if she revealed her identity. Finally, the caller said Big Tudy knew that Rodriguez would not say anything to the police and "is going to take the rap," but that Big Tudy was about to leave for Texas.

Detective Mayer knew that Big Tudy was Rosales's nickname. He was familiar with Rosales by reputation and knew his younger brother ("Little Tudy").

Raymond Lilley, a South Gate Police Department sergeant, was better acquainted with Rosales. Lilley was an expert on local gangs and had followed Rosales's career since 1974 when Rosales was allegedly involved in a high school stabbing. He knew that Rosales had fled to Texas several years before, when he was wanted for armed robbery. He also knew that Rosales had returned and had assumed a leadership position in the Elm Street gang. He related all of this to Detective Mayer.

Detective Galbreath, the investigating officer, Lilley and Mayer all thought it was likely that Rosales would flee to Texas, if he had not done so already.

Mayer went to Little Tudy's home, hoping to find Rosales. While driving by the house, Mayer saw Little Tudy pull up. Knowing that he had been seen by Little Tudy, Mayer stopped to make contact. At that time, he saw Rosales standing in the front yard. Rosales looked in Mayer's direction, and

immediately ran into the house. Mayer called for backup on a hand-held radio, and Little Tudy yelled to his brother that the officer knew he was there. Rosales emerged from the house and was arrested.

■ The Attorney General agrees that uncorroborated information of an anonymous nonvictim witness is not a sufficient basis to provide probable cause to arrest. (See *People* v. *Abbott* (1970) 3 Cal.App.3d 966, 971 [84 Cal. Rptr. 40].) But, he argues, there is corroboration in this case, in the officers' expert knowledge of Rosales's past criminal activities, his membership in the Elm Street gang, and his previous flight to Texas.

The weight that may be given to information received from an anonymous informant was extensively considered in *Illinois* v. *Gates* (1983) 462 U.S. 213 [76 L. Ed. 2d 527, 103 S. Ct. 2317]. *Gates* is best known for its rejection of the two-prong *Aguilar-Spinelli* [4] rule for testing the adequacy of a search warrant declaration that is based on information supplied by an anonymous informant. *Gates* replaced that test with a totality-of-the-circumstances approach. It found that approach to be "far more consistent with [the court's] prior treatment of probable cause than is any rigid demand that specific 'tests' be satisfied by every informant's tip. Perhaps the central teaching of our decisions bearing on the probable-cause standard is that it is a 'practical, nontechnical conception.' [Citation.]" (*Id.* at pp. 230-231, fn. omitted [76 L. Ed. 2d at pp. 543-544].) "[It] is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types of persons. . . ." (*Id.* at p. 232 [76 L. Ed. 2d at p. 544].) And even in cases in which the informant's motives may be doubted, "his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case." (*Id.* at p. 234 [76 L. Ed. 2d at p. 545].)

■ In light of California Constitution, article I, section 28, subdivision (d), evidence may be excluded on search and seizure grounds only when that result is commanded by federal law. (*In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744].) That principle makes the *Gates* totality-of-the-circumstances rule applicable to challenges to the adequacy of a search warrant affidavit. (*People* v. *Meyer* (1986) 183 Cal.App.3d 1150, 1159 [228 Cal. Rptr. 635].)

■ As we have seen, California has applied a totality-of-the-circumstances approach to test probable cause for an arrest, as well. We see no

---

[4] *Aguilar* v.*Texas* (1964) 378 U.S. 108 [12 L. Ed. 2d 723, 84 S. Ct. 1509]; *Spinelli* v. *United States* (1969) 393 U.S. 410 [21 L. Ed. 2d 637, 89 S. Ct. 584].

reason why the full *Gates* rationale, including its discussion of the weight to be given information from an anonymous informant, should not be as fully applicable to the question of probable cause to support an arrest as it is to a search. That, in fact, appears to be its application in federal cases. (See *United States* v. *Fixen* (9th Cir. 1986) 780 F.2d 1434, 1436; *English* v. *Sava* (S.D.N.Y. 1983) 571 F.Supp. 1029, 1041-1043.)

It is true that *Gates* discusses the need to encourage the use of warrants and concludes that if officers' affidavits are subjected to too much scrutiny, police might be encouraged to resort to warrantless searches, hoping to be able to rely upon a recognized exception to the warrant requirement. (462 U.S. at p. 236 [76 L. Ed. 2d at pp. 546-547].) That rationale is but one of many stated in support of the *Gates* holding, and a secondary one at that. (See 1 LaFave, Search and Seizure (2d ed. 1987) Probable Cause, § 3.1(c), p. 550; but see § 3.3(a), p. 618 et seq. (criticism of *Gates* rationale).)

We conclude that the *Gates* totality-of-the-circumstances approach applies to probable cause analyses for arrests in general, and to the weight that may be given to information from an anonymous informant in particular.

In this case, the anonymous telephone caller possessed a wealth of specific information about the shooting. She knew the identity of the respective gangs involved and of their enmity, how the shooting occurred, and when it occurred; she recognized the shooter (Rosales) and one of his accomplices (Mayfield); she knew that each was a member of the Elm Street gang; and she knew where Rosales lived. Finally, she knew that Rosales was planning to flee to Texas. The caller also explained how she happened to know all of this: she was acquainted with the defendants and she was inside the home at the location of the shooting when it occurred.

By the time that Detective Mayer arrested Rosales, he knew that much of the caller's information already had been corroborated. The shooting had occurred as described; defendants were members of a gang that was out for revenge against a rival gang of which two of the victims were members; the drive-by shooting occurred at their residence; and Rosales had fled to Texas once before in order to avoid prosecution in California.

Finally, when Detective Mayer appeared at the Rosales residence, Rosales saw Mayer and immediately ran inside his house. His flight, under these circumstances, is a further basis to suspect his guilt. (See *People* v. *Siegenthaler* (1972) 7 Cal.3d 465, 469 [103 Cal. Rptr. 243, 499 P.2d 499].)

Just as in *Massachusetts* v. *Upton* (1984) 466 U.S. 727 [80 L. Ed. 2d 721, 104 S. St. 2085], a case that followed *Gates* and applied its analysis of the

weight to be given information received from an unidentified caller, the informant's story and the surrounding facts in this case "possessed an internal coherence that gave weight to the whole." (466 U.S. at p. 734 [80 L. Ed. 2d at p. 728].) Added to the corroborating information obtained from the field investigation, Rosales's flight at the sight of a detective, and the detectives' knowledge of gang behavior in the area (see *People* v. *Superior Court (Price), supra,* 137 Cal.App.3d at p. 96; *People* v. *Superior Court (Orozco)* (1981) 121 Cal.App.3d 395, 403 [175 Cal. Rptr. 322]), the informant's detailed statement provided "a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion" that Rosales was guilty of a crime. (See *People* v. *Ingle, supra,* 53 Cal.2d at p. 412.) Hence, there was probable cause for the arrest, and the motion to suppress was properly denied.

B. *Inevitable Discovery*

█ Even if we were to conclude that Detective Mayer lacked probable cause to arrest Rosales, we would still agree that the fingerprint evidence was admissible under the inevitable discovery doctrine. We uphold the ruling of the trial court on this alternative ground.

Under the inevitable discovery rule, evidence obtained by illegal means is still admissible if it would have been obtained by the police through lawful means. The inevitability of the lawful discovery removes the "taint" of illegality that otherwise would attach to the evidence, and leaves no exclusionary rule barrier to its admission. (See *Nix* v. *Williams* (1984) 467 U.S. 431, 444 [81 L. Ed. 2d 377, 387-388, 104 S. Ct. 2501]; *Green* v. *Superior Court* (1985) 40 Cal.3d 126, 146 [219 Cal. Rptr. 186, 707 P.2d 248]; *People* v. *Superior Court (Tunch)* (1978) 80 Cal.App.3d 665, 673 [145 Cal. Rptr. 795].)

In this case, police had confiscated the pickup truck used in the drive-by shooting, and had lifted fingerprints from its interior and exterior surfaces. Further, the police had information that both defendants had been involved in the shooting, and that each defendant had a criminal record and hence, inevitably, a set of matchable prints.[5]

It is inconceivable that a match-up would not have been made. At the very least, the record supports the trial court's implied decision on that issue.

---

[5] See article 4413(14), Texas Revised Civil Statutes Annotated (Vernon) (Texas Bureau of Identification and Records is responsible for preserving and maintaining a file of the fingerprints of all persons convicted of a felony in Texas). Rosales had suffered two felony convictions in Texas.

II., III.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## DISPOSITION

The judgment of conviction as to Rosales is modified by deletion of the enhancement for a prior conviction for burglary in Texas; the abstract of judgment as to Mayfield is modified to reflect 912 days of credit. In all other respects, the judgments are affirmed.

Feinerman, P. J., and Hastings, J., concurred.

Appellants' petitions for review by the Supreme Court were denied September 23, 1987.

---

*See footnote, *ante*, page 759.