Filed 12/17/24  In re S.G. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re S.G., a Person Coming Under the Juvenile Court Law. | B320775<br><br>(Los Angeles County Super. Ct. No. KJ41334) |
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>S.G.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Steven E. Ipson, Judge.  Affirmed with directions.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

## INTRODUCTION

S.G., a minor at the time the offenses were committed, appeals the juvenile court's disposition order sustaining a petition under Welfare and Institutions Code section 602 and declaring S.G. a ward of the court.[1]  The court sustained allegations that S.G. committed murder and attempted premeditated murder, and it ordered S.G. committed to a secure youth treatment facility for a base term of seven years and a maximum term of 15 years to life.

S.G. argues that law enforcement arrested him without probable cause and violated his Fifth Amendment rights by soliciting incriminating statements during an undercover operation after he had invoked his right to counsel.  S.G. further argues he is entitled to the ameliorative benefit of Assembly Bill No. 200, which amended the secure youth treatment facility commitment statute in section 875 after his disposition hearing.

We affirm the juvenile court's order sustaining the petition, but we vacate the disposition and remand for a new disposition hearing so the court may apply the amendments to section 875 to S.G.

---

[1]     All undesignated statutory references are to the Welfare and Institutions Code.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Offenses*

S.G. was affiliated with the Puente 13 gang, based in La Puente.  On July 14, 2019, when S.G. was 17 years old, S.G. and two Puente 13 members—Eric Albaverra and Emmanuel Marquez—were driving through Azusa in a black Toyota.[2]  S.G. was driving the Toyota, Albaverra sat in the front passenger seat, and Marquez rode in the backseat.  Following the Toyota was a gray Honda Civic, belonging to S.G., driven by Puente 13 associate Robert Molina.

At approximately 7:30 or 7:45 p.m., S.G., Albaverra, Marquez, and Molina spotted two members of the rival Azusa 13 gang, John Medrano and Juan Garcia.  Medrano and Garcia were wearing "baseball caps with an 'A'" and tagging graffiti on behalf of Azusa 13.

S.G. made a U-turn toward Medrano and Garcia because he "knew what was gonna happen."  Albaverra, also known as "Stomps," handed a gun to Marquez, known as "Bulldog."  S.G. stopped the Toyota and Marquez got out.  Marquez fired six shots, killing Medrano but missing Garcia.  Marquez returned to the car, and S.G. drove away from the scene.

B.    *Investigation and S.G.'s Arrest*

Deputy Sheriff Antonio Guillen with the Los Angeles County Sheriff's Department investigated the shooting.  Deputy Guillen testified at a preliminary hearing that he reviewed video

---

[2]    Several spellings of Albaverra's last name appear in the record and briefing.  We adopt the juvenile court's spelling, as reflected in the court's February 22, 2022 statement of decision.

3

surveillance footage of the intersection where the shooting took place. Video surveillance from nearby businesses showed a gray Honda sedan "pull[ing] up alongside" Medrano and Garcia, catching their attention, then turning away. Deputy Guillen identified this gray Honda as "a vehicle of interest in [the] investigation." The surveillance video then showed a black Toyota "com[ing] to a stop" near Medrano and Garcia; a man exiting the Toyota, "tak[ing] a shooting stance" and "aim[ing] toward" Medrano and Garcia; and the shooter escaping in the Toyota.

Through his investigation, Deputy Guillen learned that S.G. received a traffic citation two days before the murder while driving a gray Honda Civic. The traffic citation confirmed S.G.'s phone number.

Pursuant to a search warrant, Deputy Guillen obtained "call detail records" from S.G.'s phone showing his "incoming and outgoing phone calls, [and] texts" and "the information of where the phone calls are pinging from." The records revealed that S.G.'s phone was present "in the area of Azusa where the murder took place" between 7:00 and 8:00 p.m. Deputy Guillen also wiretapped S.G.'s phone, starting on August 13, 2019, to intercept the content of his phone calls.

Deputy Guillen searched Marquez's house and questioned Marquez. Deputy Guillen also visited S.G.'s residence and spoke to his family about the family cars and S.G.'s whereabouts. Deputy Guillen learned S.G. was staying at a juvenile placement facility called Boys Republic, and he called the facility to schedule

an interview with S.G. for October 28, 2019.[3]  Just before the interview, Deputy Guillen's wiretap intercepted a phone call on October 28 between Marquez and S.G.  S.G. told Marquez that law enforcement had contacted his family and now Boys Republic staff "'was telling me that the police is coming over here to question me.'"  Marquez told S.G. to "'stay solid'" and "'stay strong,'" which Deputy Guillen interpreted to mean "'don't cooperate with the police'" and "'make sure that I can trust you.'"

On October 28, Deputy Guillen's wiretap recorded a pre-interview call between S.G. and Molina.  Molina referenced the shooting in Azusa and S.G. asked, "'Hey, you think if I [go] AWOL it's going to be bad?'"  Later in the call, S.G. told Molina, "'I am gonna [go] AWOL.'"

In his interview with Deputy Guillen on October 28, 2019, S.G. admitted he once owned a gray Honda Civic, but he had crashed it sometime after July 14, 2019.  S.G. stated he was in Azusa on the day of the murder because "he knew girls over there."  S.G. confirmed his phone number at the time of the murder, but told Deputy Guillen "[h]e no longer had that phone."

Deputy Guillen interviewed Molina on November 22, 2019.  Molina admitted that he was a "Puente gang member from the Dial clique," and informed Deputy Guillen that S.G., Marquez, and Albaverra were "Puente gang members from the Hurley clique."  Molina told Deputy Guillen that, on the day of the shooting, he and S.G. were driving S.G.'s Honda Civic to Azusa when they received a phone call and decided to drive to

---

[3]     S.G. was placed at Boys Republic pursuant to an unrelated juvenile adjudication.  Boys Republic was "not secured," meaning there was no "gate, [or] walls" and residents "could walk in and out."

5

Marquez's workplace in Azusa. There, they "met with Bulldog [Marquez] and Stomper [Albaverra] . . . since they were all from the same clique." Molina described that "[S.G.] left with Stomper and with Bulldog" in "Stomper's car, which is a black Toyota," and Molina drove off alone in S.G.'s car. Molina stated that the two cars "drove the same direction" through Azusa when they noticed Medrano and Garcia, recognized them as rival gang members, and made a U-turn to confront them. The rest of Molina's account corresponded to the events captured by surveillance video: the Honda pulling alongside Medrano and Garcia, then the Toyota dropping off the shooter.

Deputy Guillen found a photograph on social media "depicting [S.G.] along with Emmanuel Marquez, Bulldog . . . both doing a hand sign with a 'P,' suggesting they are for Puente." Based on his law enforcement experience with gangs in Azusa and La Puente, Deputy Guillen believed S.G. was in the car with Albaverra and Marquez on a gang "mission" to promote Puente 13. Deputy Guillen testified that in "gang culture," members would commit a shooting only in the company of "other gang members" because "they wouldn't have trusted [non-members] enough to keep quiet."

Deputy Guillen testified at the preliminary hearing that all of the above circumstances factored into his determination of probable cause to arrest S.G. S.G. was arrested on June 18, 2020.

C.    Perkins *Operation*

On the day of his arrest, S.G. was transported to the sheriff's station at the City of Industry and placed in a cell with

6

two undercover agents for a *Perkins* operation.[4]  S.G. and the *Perkins* agents talked for approximately two hours and 40 minutes.  Their conversation was recorded by two sheriff's detectives from the Homicide Gang Task Force.  The *Perkins* agents received compensation of $750 each for their participation in the operation.

The *Perkins* agents posed as older gang members, and S.G. introduced himself as "Hyper" from the Dial Boulevard clique of Puente 13.  S.G. initially told the agents he was a backseat passenger in the car when Marquez shot at the victims.

About half an hour later, law enforcement removed S.G. from the cell, advised him of his *Miranda* rights, and informed him why he was under arrest.  The detectives confronted S.G. with some photos of his Honda vehicle.  S.G. invoked his right to remain silent and requested an attorney.  S.G. then returned to his cell, where the *Perkins* operation resumed.

S.G. disclosed to the *Perkins* agents that on the day of the shooting, he was driving Marquez and Albaverra in Albaverra's car, followed by Molina in S.G.'s car.  S.G. acknowledged that he told the agents earlier that he was in the backseat because "they told me just, like keep my mouth shut" and "not to say too much," but he decided he could "trust the homie."  S.G. described that when the group spotted the Azusa-13 members tagging, S.G. "busted" a U-turn "[b]ecause I knew what was gonna happen. . . . [O]nce I made the turn, everything happened and then, I just drove off."

---

[4]     *Illinois v. Perkins* (1990) 496 U.S. 292.

D.  *Juvenile Court Proceedings*

The People filed a first amended petition on May 19, 2021, to declare S.G. a ward of the juvenile court pursuant to section 602.  The petition alleged S.G. had committed murder (Pen. Code, § 187, subd. (a)) and attempted premeditated murder (Pen. Code, §§ 187, subd. (a); 664).

On November 19, 2021, S.G. moved through his appointed counsel to suppress his statements during the *Perkins* operation as the products of an unlawful arrest and the violation of his Fifth, Sixth, and Fourteenth Amendment rights.  The juvenile court denied S.G.'s motions on February 22, 2022.  The court determined S.G.'s arrest was supported by probable cause gathered from Deputy Guillen's investigation.  The court further ruled that the *Perkins* operation did not constitute custodial interrogation within the meaning of the Fifth Amendment; that S.G. had not been charged at the time of the operation and thus his Sixth Amendment right to counsel had not yet attached; and that S.G.'s statements were voluntary and did not violate the Fourteenth Amendment's guarantee of due process.

S.G. proceeded to trial on February 22, 2022.  He did not testify or present a trial defense.  The juvenile court sustained count 1 for second degree murder and count 2 for attempted murder.  The court declared S.G. a ward of the court and ordered him placed in a secure youth treatment facility for a baseline term of seven years and a maximum term of 15 years to life.

S.G. timely appealed.

8

# DISCUSSION

S.G. argues that the admission of his statements from the *Perkins* operation violated his Fifth and Fourteenth Amendment rights, and that law enforcement lacked probable cause to arrest him. S.G. further requests a new disposition hearing based on Assembly Bill No. 200, which amended the secure youth treatment facility commitment statute, section 875, effective June 30, 2022.

## A.    *Fifth Amendment*

S.G. argues that continuing the *Perkins* operation after he had invoked his right to counsel with the detectives violated his Fifth Amendment rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

### 1.    *Governing Law and Standard of Review*

"The Fifth Amendment of the United States Constitution provides that no person 'shall be compelled in any criminal case to be a witness against himself.'" (*Colorado v. Spring* (1987) 479 U.S. 564, 572.)

In *Miranda*, the Supreme Court held the Fifth Amendment guards against "mental as well as physical" "coercion" by law enforcement during interrogation. (*Miranda, supra,* 384 U.S. at p. 448.) *Miranda* held that statements resulting from custodial interrogation are inadmissible under the Fifth Amendment if a suspect has not received warnings of his rights to remain silent and to consult with an attorney. (See *id.* at p. 444.) The Court defined custodial interrogation as "questioning initiated by law

enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action." (*Ibid.*)

*Miranda* dictates that during custodial interrogation, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." (*Miranda, supra,* 384 U.S. at p. 474.) The Fifth Amendment prohibits police from reapproaching a suspect who has invoked his right to counsel, until counsel is available, or the suspect initiates communication with police. (See *Edwards v. Arizona* (1981) 451 U.S. 477, 484-485 (*Edwards*).)

By contrast, "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda.*" (*Illinois v. Perkins* (1990) 496 U.S. 292, 296 (*Perkins*).) Because "the danger of coercion results from the interaction of custody and official interrogation," "[w]hen a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." (*Id.* at pp. 296-297.) *Perkins* clarified that "*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner." (*Id.* at p. 297.)

S.G. does not dispute any factual findings underlying the juvenile court's suppression ruling. Accordingly, we "'independently determine from the undisputed facts . . . whether the challenged statement[s] w[ere] illegally obtained'" in violation of *Miranda.* (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033 (*Bradford*); accord, *People v. Waidla* (2000) 22 Cal.4th 690, 730.)

10

2.     *The* Perkins *Operation Did Not Violate S.G.'s*
        Miranda *Rights*

S.G. contends that the *Perkins* operation constituted custodial interrogation, triggering his *Miranda* rights, because the *Perkins* agents were "paid police agents" who "deliberately intended to elicit incriminating information from [S.G.]" Thus, S.G. asserts that, after he invoked his *Miranda* rights to silence and counsel with the detectives, the *Perkins* agents violated his Fifth Amendment rights by continuing to question him about the case.

S.G.'s argument is foreclosed by precedent. As the California Supreme Court has explained, "*Miranda's* aim is to ensure that the suspect's will to remain silent is not overborne by the coercive atmosphere of *police questioning* in custody. Both 'custody' and 'police questioning' are necessary to invoke *Miranda*, and both concepts are viewed from the suspect's perspective. [Citation.] Even when the suspect is in the process of a custodial interrogation, voluntary statements to someone the suspect does not believe is a police officer or agent, in a conversation the suspect assumes is private, simply does not involve one of these two critical concerns." (*People v. Tate* (2010) 49 Cal.4th 635, 686; accord, *People v. Davis* (2005) 36 Cal.4th 510, 555 [*Miranda* not violated where "defendant 'consider[ed] himself in the company of cellmates and not officers'"]; *People v. Williams* (1988) 44 Cal.3d 1127, 1141-1142 (*Williams*) [*Miranda* "does not apply . . . to nonpolice custodial interrogation" and "has never been applied to conversations between an inmate and an undercover agent"].) S.G.'s conversation with the undercover agents, whom he thought were fellow detainees, was not a custodial interrogation activating *Miranda*'s protections.

11

Citing *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*), S.G. argues his interrogation by the *Perkins* agents does qualify as law enforcement interrogation because "the undercover agents deliberately intended to elicit incriminating information from appellant as part of a preexisting arrangement with law enforcement." *Massiah* held that, under the Sixth Amendment, the government cannot use undercover agents or informants to deliberately elicit incriminating statements from a defendant without the presence of his counsel. (See *id.* at p. 206; *In re Neely* (1993) 6 Cal.4th 901, 915.)

S.G. concedes, however, that *Massiah* addressed the Sixth Amendment right to counsel, not the Fifth Amendment right to counsel articulated in *Miranda*. Unlike its Fifth Amendment analogue, which applies before a suspect is formally charged, the Sixth Amendment right to counsel "does not attach until a prosecution is commenced . . . "'by way of formal charge, preliminary hearing, indictment, information, or arraignment.'"" (*McNeil v. Wisconsin* (1991) 501 U.S. 171, 175; see *People v. Fayed* (2020) 9 Cal.5th 147, 161 (*Fayed*).) Thus, the California Supreme Court has held *Massiah* does not apply to an undercover operation occurring before a defendant is formally charged. (See *Fayed*, at p. 162; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 284.) Because S.G. was not formally charged at the time of the *Perkins* operation, *Massiah* does not apply.

S.G. also argues that the undercover agents subjected him to interrogation within the meaning of *Rhode Island v. Innis* (1980) 446 U.S. 291 (*Innis*). *Innis* held that interrogation under *Miranda* includes "express questioning" and "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." (*Innis,*

at p. 301.) S.G. argues that "law enforcement's deceptive use of an undercover agent is an action on the part of police that the police should know is reasonably likely to elicit an incriminating response." *Innis*, however, emphasized that whether words or actions are likely to prompt an incriminating response depends "primarily upon the perceptions of the suspect, rather than the intent of police." (*Ibid.*) From the perspective of S.G., who believed he was speaking with fellow detainees, the undercover operation did not constitute law enforcement interrogation, because S.G. would not "feel that he was being coerced to incriminate himself in any way." (*Arizona v. Mauro* (1987) 481 U.S. 520, 528.)

S.G. next argues that his continued interrogation by the *Perkins* agents violates the Fifth Amendment right to counsel established in *Edwards*, *supra*, 451 U.S. 477. *Edwards* held that police may not "reinterrogate an accused in custody if he has clearly asserted his right to counsel," unless the suspect subsequently makes a knowing and intelligent waiver of his right to counsel. (*Id.* at pp. 484-485.) S.G. contends the rule in *Edwards* supersedes the rule in *Perkins* and prevents the use of a *Perkins* operation to question a suspect who has invoked his right to counsel. In support of his interpretation, S.G. cites Justice Brennan's concurrence in *Perkins*, which opined, "Nothing in the [*Perkins* majority] opinion suggests that, had [defendant] previously invoked his Fifth Amendment right to counsel or right to silence, his statements [during the undercover operation] would be admissible." (*Perkins*, *supra*, 496 U.S. at p. 300, fn. * (conc. opn. of Brennan, J.).)

S.G.'s argument is again foreclosed by precedent. "California courts have uniformly come to the conclusion that

13

*Perkins* controls when a suspect invokes his *Miranda* right to counsel but later speaks with someone he does not know is an agent of the police." (*People v. Orozco* (2019) 32 Cal.App.5th 802, 812-817 (*Orozco*) [rejecting application of *Edwards* rule and deeming Justice Brennan concurrence "dicta"]; accord, *People v. Felix* (2024) 100 Cal.App.5th 439, 450-453; *People v. Guilmette* (1991) 1 Cal.App.4th 1534, 1541-1542 [rejecting application of *Edwards* to *Perkins* operation].)

 In sum, S.G. does not show the *Perkins* operation violated his Fifth Amendment rights, because "[c]onversations with undercover police agents posing as fellow cellmates do not implicate Fifth Amendment *Miranda* concerns."[5] (*People v. Jefferson* (2008) 158 Cal.App.4th 830, 841; accord, *Williams*, *supra*, 44 Cal.3d at pp. 1141-1142.)

---

[5] S.G. also argues that his conversation with detectives during the *Perkins* operation, where the detectives informed him of incriminating evidence, "violated *Miranda* and *Edwards*" and tainted the results of the *Perkins* operation. He contends the violation occurred because the detectives' presentation of incriminating evidence "occurred after [S.G.] had already invoked his right to counsel."

 The record does not support S.G.'s argument. Detective Guillen testified that he advised S.G. of his *Miranda* rights, showed S.G. photos of his Honda, and "then [S.G.] invoked his Fifth Amendment rights, and he requested an attorney." S.G. does not support his interpretation with citations to the record, and thus, we must reject his factual assertion and conclude the detectives did not violate S.G.'s Fifth Amendment rights during their conversation with S.G.

14

B.  *Fourteenth Amendment*

S.G. asserts his confession to the *Perkins* agents was involuntary, denying him due process under the Fourteenth Amendment.

1.  *Governing Law and Standard of Review*

"The use of an involuntary confession for any purpose in a criminal or delinquency proceeding violates a defendant's or minor's rights under the Fourteenth Amendment." (*In re Elias V.* (2015) 237 Cal.App.4th 568, 576; accord, *People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199 (*Rodriguez*) [involuntary confessions barred by "due process clauses of the federal and California constitutions"].) "For these purposes, a confession is involuntary if official coercion caused the defendant's will to be overborn, such that the resulting statement is not the product of "'"'a rational intellect and free will.'"'"'" (*Orozco*, *supra*, 32 Cal.App.5th at p. 819; accord, *People v. McWhorter* (2009) 47 Cal.4th 318, 346-347 (*McWhorter*).) "'"'Voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the "totality of [the] circumstances."'" [Citation.] The test considers several factors, including any element of police coercion, the length of the interrogation and its location and continuity, and the defendant's maturity, education, and physical and mental health.'" (*People v. Suarez* (2020) 10 Cal.5th 116, 157 (*Suarez*).)

S.G. does not dispute any factual findings in the juvenile court's suppression decision, so we independently review the undisputed facts surrounding his confession for a violation of due process. (See *People v. Mays* (2009) 174 Cal.App.4th 156, 164

15

(*Mays*); accord, *Suarez, supra,* 10 Cal.5th at p. 158; *McWhorter, supra,* 47 Cal.4th at p. 346.)

2.  *S.G.'s Confession Was Voluntary Within the Meaning of the Fourteenth Amendment*

S.G. contends "the deceptive strategy to continue interrogating appellant after he invoked his *Miranda* rights through the continued use of the undercover agents" rendered his confession involuntary. He argues the *Perkins* operation overcame his will "not [to] speak with law enforcement, especially not without counsel."

"Police trickery that occurs in the process of a criminal interrogation does not, by itself, render a confession involuntary and violate the state or federal due process clause[,] . . . [b]ecause subterfuge is not necessarily coercive in nature. [Citation.] And unless the police engage in conduct which coerces a suspect into confessing, no finding of involuntariness can be made." (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280.) Rather, police deception "is prohibited only when, in light of all the circumstances, it is so coercive that it tends to result in a statement that is both involuntary and unreliable." (*Mays, supra,* 174 Cal.App.4th at p. 164.)

The circumstances surrounding S.G.'s confession establish that, although he did not know he was speaking to undercover agents, his statements were voluntary and uncoerced. As the juvenile court observed, and as our independent review indicates, the *Perkins* transcript shows S.G. willingly responded to his cellmates' questions about his gang affiliation and the circumstances of the shooting. (See *Rodriguez, supra,* 40 Cal.App.5th at p. 199 [due process not violated by confession

16

to undercover informant who claimed to be an "older gang member" during "friend[ly]" interaction]; *Orozco, supra,* 32 Cal.App.5th at pp. 819-820 [due process not violated by confronting defendant with secret informant, after he requested counsel, "to see if he would talk"]; *Bradford, supra,* 14 Cal.4th at pp. 1041-1042 [defendant's statements were voluntary even though he had invoked his right to counsel because he was "eager[] to talk"].)  Because S.G. does not identify any coercive circumstances beyond the fact of the undercover operation, we conclude the Fourteenth Amendment was not violated.

C.    *Probable Cause To Arrest*

S.G. next argues law enforcement lacked probable cause to arrest him, and thus the juvenile court should have suppressed his confession to the *Perkins* agents.

1.    *Governing Law and Standard of Review*

"'To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause.'" (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 238.)  "'Determining whether an officer had cause to arrest requires two analytically distinct steps, each with its own standard of review.  First, the court ascertains when the arrest occurred and what the arresting officer then knew; second, the court decides whether the officer's knowledge at the time of arrest constituted adequate cause.'" (*In re Justin B.* (1999) 69 Cal.App.4th 879, 887; accord, *People v. Duncan* (1986) 42 Cal.3d 91, 97.)  "Probable cause to arrest exists if facts known

17

to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that an individual is guilty of a crime." (*People v. Kraft* (2000) 23 Cal.4th 978, 1037.)

S.G. does not dispute the facts that were known to law enforcement at the time of his arrest. We review the record in the light most favorable to the juvenile court's suppression ruling and independently review the juvenile court's application of the law to the facts. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 969; *In re H.H.* (2009) 174 Cal.App.4th 653, 657.)

2. *Law Enforcement Had Probable Cause to Arrest S.G.*

The facts known to law enforcement before S.G.'s arrest, as described by Deputy Guillen's preliminary hearing testimony, established probable cause to arrest S.G.

Deputy Guillen testified that surveillance footage of the shooting showed a gray Honda sedan and a black Toyota at the scene, and that traffic citation records showed S.G. owned a gray Honda Civic. S.G.'s cellphone records also showed he was in the vicinity of the shooting at the time it occurred. S.G. later confirmed both of these facts in an interview with Deputy Guillen before his arrest.

Through further investigation, Deputy Guillen learned the shooting was gang motivated. Molina told Deputy Guillen that he, S.G., Marquez, and Albaverra were members of Puente 13, and on the day of the shooting, S.G. joined Marquez and Albaverra in Albaverra's black Toyota. Molina stated their group spotted Medrano and Garcia wearing caps with an "A," the group identified them as rival Azusa 13 members, and a passenger from the Toyota fired shots at them. (See *In re Jessie L.* (1982)

18

131 Cal.App.3d 202, 211-212 [statement by accomplice implicating minor in crime, corroborated by independent investigation, supplied probable cause for arrest]; *People v. Hill* (1968) 69 Cal.2d 550, 553 [probable cause to arrest "clearly" existed where defendant's "participation in the [crime] was attested by his cohorts" and "their admissions . . . were corroborated in material particulars"].)

Deputy Guillen also found a photo of S.G. and Marquez on social media making "P" hand signs, suggesting Puente 13 affiliation. Deputy Guillen testified that, based on his law enforcement experience with gang investigations, he believed S.G., Albaverra, Marquez, and Molina were on a gang "mission" on the day of the shooting and that they committed the shooting with an understanding their gang would "keep quiet" about it. (See *People v. Superior Court* (*Price*) (1982) 137 Cal.App.3d 90, 96 ["Officer expertise in the field of street gang activities has been duly credited as a factor contributing to the existence of probable cause for arrest in a street gang drive-by shooting."]; accord, *People v. Superior Court* (*Orozco*) (1981) 121 Cal.App.3d 395, 403.)

In a wiretapped phone conversation, S.G. expressed his desire to go "AWOL" and avoid an interview with Deputy Guillen. (See *In re Rafael V.* (1982) 132 Cal.App.3d 977, 982-983 [fact that "minor knew the officer wanted to talk to him but he bolted and disappeared . . . constitute[d] evidence of consciousness of guilt" contributing to probable cause]; accord, *People v. Guajardo* (1994) 23 Cal.App.4th 1738, 1742 [probable cause includes "some indication by the defendant of a consciousness of guilt"].)

Taken together, these circumstances establish that Deputy Guillen had probable cause to arrest S.G. for his involvement in

19

the shooting. (See *People v. Rosales* (1987) 192 Cal.App.3d 759, 769 [affirming probable cause to arrest based on informant's story incriminating defendant, "corroborating information obtained from the field investigation," defendant's consciousness of guilt through "flight," and police "knowledge of gang behavior in the area"]; *Price, supra,* 137 Cal.App.3d at pp. 96-97 [same, based on "investigation at the homicide scene," officer's "knowledge of gang locations and rivalries," defendant's membership in a gang, the identification of a fellow gang member as an assailant, and defendant's display of consciousness of guilt]; *People v. Superior Court (Orozco), supra,* 121 Cal.App.3d at pp. 404–405 [same, where police knew shooting was gang-motivated, defendants were gang members, one defendant owned a car fitting description of the shooter's vehicle, informants implicated defendants, and defendants later attempted to avoid interaction with police officer].)

S.G. argues there was no probable cause because the circumstances known to Deputy Guillen "lacked any specificity that [he] was involved in the shooting other than as a passenger in the car." (Cf. *Ybarra v. Illinois* (1979) 444 U.S. 85, 91 ["a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person"].) He contends that, at the time of his arrest, "police believed that Bulldog was the shooter, Molina was driving a second car, and Stomps was the driver."

While S.G.'s presence as an innocent passenger is one explanation for the circumstances of the shooting then known to police, there was still probable cause to suggest S.G. was involved in the shooting in some way. "'When, as here, the facts known to an officer are sufficient to constitute probable cause to arrest, the

20

possibility of an innocent explanation does not vitiate probable cause and does not render an arrest unlawful.'" (*In re J.G.* (2010) 188 Cal.App.4th 1501, 1504; accord, *Johnson v. Lewis* (2004) 120 Cal.App.4th 443, 453; cf. *Illinois v. Gates* (1983) 462 U.S. 213, 235 [probable cause is "'only the probability, and not a prima facie showing, of criminal activity'"].) It was probable that, even as a passenger in the car, S.G. aided and abetted the shooting through some "'act or advice'" that "'aid[ed], promote[d], encourage[d] or instigate[d] the commission of the crime.'" (*People v. Delgado* (2013) 56 Cal.4th 480, 486.) S.G.'s gang affiliation with the passengers in the car suggested S.G. knew the shooter's purpose and thus he could have acted with intent to aid the crime. (*See ibid.* [mens rea for aider and abettor].) Even without evidence that S.G. was the driver, there was probable cause that S.G. aided and abetted the shooting while he was present in the vehicle.

D.     *S.G. Is Entitled to a New Disposition Hearing*

S.G. argues his maximum term of commitment must be reduced under amendments to section 875, the secure youth treatment facility commitment statute, made by Assembly Bill No. 200 after his disposition hearing took place. The People concede that Assembly Bill No. 200 applies retroactively to S.G.'s case, requiring remand for a new disposition hearing. We agree.

At the time of S.G.'s disposition hearing in April 2022, section 875, subdivision (c)(1), provided: "In making its order of commitment, the court shall additionally set a maximum term of confinement for the ward in a secure youth treatment facility." The statute provided limits on the maximum term of confinement, depending on the minor's age, the date of

21

commitment, and the term of confinement authorized for an adult convicted of the same offense. (See § 875, subd. (c) (1)-(2), as amended by Stats. 2021, ch. 18, § 12 (S.B. 92) (effective May 14, 2021 to June 29, 2022).)

Assembly Bill No. 200, effective June 30, 2022, amended section 875, subdivision (c)(1), to add: "In making its order of commitment, the court shall additionally set a maximum term of confinement for the ward based upon the facts and circumstances of the matter or matters that brought or continued the ward under the jurisdiction of the court and as deemed appropriate to achieve rehabilitation." (Stats. 2022, ch. 58, § 41 (A.B. 200).) Assembly Bill No. 200 maintained the same outer limits on the maximum term of confinement, based on age, date of commitment, and the term of imprisonment for an adult offender. (See *ibid.*)

The Legislative Counsel's Digest to Assembly Bill No. 200 states: "Existing law requires the court to set a maximum term of confinement for the ward in a secure youth treatment facility. [¶] This bill would, among other things . . . require that the maximum term of confinement for the ward be based upon the facts and circumstances of the matter or matters that brought or continued the ward under the jurisdiction of the court and as deemed appropriate to achieve rehabilitation." The bill did not contain any provision regarding retroactive or prospective application.

We conclude the changes made by Assembly Bill No. 200 are ameliorative and apply retroactively to S.G.'s case under the rule of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*). "The holding in *Estrada* was founded on the premise that "'[a] legislative mitigation of the penalty for a particular crime

22

represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law,'" [citation] and the corollary inference that the Legislature intended the lesser penalty to apply to crimes already committed." (*People v. Brown* (2012) 54 Cal.4th 314, 325, italics omitted; accord, *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 307-308 (*Lara*).) *Estrada* applies "to statutes that give trial courts discretion to impose lesser punishment," among others. (*People v. Burgos* (2024) 16 Cal.5th 1, 13.) Assembly Bill No. 200 provided the juvenile court with new discretion to set a maximum punishment based on the circumstances of the offense and the ends of rehabilitation, which could result in the court imposing a lesser term of commitment than the statutory maximum. (See *In re M.B.* (2024) 99 Cal.App.5th 435, 460-461 [describing juvenile court's discretion under amended section 875, subd. (c)].) Because the bill was enacted before the resolution of S.G.'s appeal, S.G. is entitled to a new disposition hearing. (See *People v. Mani* (2022) 74 Cal.App.5th 343, 379 [applying *Estrada* rule where statutory amendment gave trial court the choice of imposing a lower sentence]; *Lara, supra,* 4 Cal.5th at pp. 303-304 [same, where statute did not "reduce the punishment for a crime" but authorized rehabilitative disposition, resulting in possibility of "more lenient treatment"].) We remand to the juvenile court for a new disposition hearing and the consideration of S.G.'s maximum term of confinement under the new provisions of section 875, subdivision (c).[6]

---

[6] S.G. concedes we need not address his remaining arguments challenging the application of his precommitment credits and requesting the correction of his commitment order if we remand for a new disposition hearing.

## DISPOSITION

The juvenile court's order sustaining the petition is affirmed.  The juvenile court is directed to vacate its disposition and to hold a new disposition hearing pursuant to amended section 875, subdivision (c)(1), and any other applicable ameliorative legislation.

MARTINEZ, P. J.

We concur:

FEUER, J.

STONE, J.

24